**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF PENNSYLVANIA**  P 5:08

USDC-EDPA

IRVIN MURRAY, MAURICE SCOTT,
DOLORES MCFADDEN,  FAITH ANNE
BURDICK, EDWIN JONES, and ALL OTHER
HOMELESS RESIDENTS OF THE
ENCAMPMENTS AT VON COLLN FIELD,          CIVIL ACTION NO:
JEFFERSON AND RIDGE, and the AZALEA
GARDENS

                    Plaintiffs,
        v.

THE CITY OF PHILADELPHIA and ITS
AGENTS,  and
MAYOR JAMES KENNEY,

                    Defendants.
                    Defendants.

---

**COMPLAINT AND REQUEST FOR TEMPORARY**
**RESTRAINING ORDER AND  INJUNCTION**


**I.        The Parties to This Complaint**


**A.        The Plaintiffs**

    Both of the following plaintiffs are residents at the encampment at 22nd Street and
    Benjamin Franklin Parkway.
    1.        Irvin Murray, Telephone Number 215-341-4674.
    2.        Maurice Scott, Telephone Number 856-993-1755.

    Both of the following plaintiffs are residents at the encampment at Jefferson and Ridge
    Streets.
    3.        Dolores McFadden, no telephone.
    4.        Faith Anne Burdick, no telephone.
    The following plaintiff is a resident at the encampment at the Azalea Gardens.
    5.        Edwin Jones, no telephone.

1

**B.**     **The Defendants**

Defendant No. 1
Name: The City of Philadelphia and its agents, employees, subdivisions, contractors and assigns.
Street Address: City Hall, Room 167. Philadelphia PA 19107
Telephone Number: (215)-686-8686.
E-mail Address: Unknown.

Defendant No. 2
Name: Mayor James Kenney
Street Address: City Hall, Office 215, Philadelphia, PA 19107
Telephone Number: (215) 686-2181
E-mail Address: james.kenney@phila.gov

## II.     Basis for Jurisdiction

This case falls properly within the jurisdiction of the Eastern District Court of Pennsylvania, as it raises several federal questions under the First Amendment, Fourth Amendment, Fourteenth Amendment, and state-created danger doctrine.

Plaintiffs believe that the  amount in controversy is zero, as Plaintiffs are requesting injunctive relief in the form of a Temporary Restraining Order and hearing for Preliminary Injunction. No amount of money could adequately compensate Plaintiffs for the damage that will be done if the Temporary Restraining Order and Preliminary Injunction is denied.

## III.     Statement of Claim

Each of the plaintiffs resides at the encampments on 22nd Street and Benjamin Franklin Parkway, the PHA Headquarters at Jefferson and Ridge, and the Azalea Gardens. Plaintiffs have consistently maintained that these encampments are protests for permanent housing, as well as their residences because they have nowhere else to go - the shelter system is completely full and rampant with COVID-19, as shelters are not following CDC guidelines regarding social distancing and PPE. The City has said that they would put people in hotels, but no one that Plaintiffs

know have gotten into the hotels despite being on the list for weeks, and regardless some plaintiffs would rather not risk the danger of leaving their safe and socially distanced tents at the encampments to go to a hotel for an unknown period of time, only to be removed after a short period and lose the support of their community. The encampments provide individual, socially distanced tent residences, free PPE and hand sanitizer, regular COVID-19 testing, clothing, outdoor showers and portable toilets, safe and healthy meals every day, and a 24/7 medic on site.

On July 10th, 12th, and 14th, Defendants served Notices upon the Plaintiffs at their encampments. A notice entitled "Second Notice" was served upon the Plaintiffs on August 17th via email to Organizer Sterling Johnson. The Notices stated that Plaintiffs must vacate their encampment homes by Tuesday, August 18, 2020, at 9:00 a.m., or the City or its agents would come and dissolve the encampments and detain and/or destroy all the property that Plaintiffs have in the world. Plaintiffs do not intend to leave, and so if the Temporary Restraining Order and/or Preliminary Injunction are not granted, the City will most certainly destroy Plaintiffs' safe shelter-in-place and protest and detain and destroy all their belongings tomorrow morning.

## IV.    Irreparable Injury

Monetary damages could never compensate the loss of all of Plaintiffs' personal effects, items of sentimental value, as well as their homes and a safe community which has provided them with so many resources. Monetary damages could never compensate Plaintiffs for the risk of contracting or dying from COVID-19 that they certainly face if they are forced to sleep alone on the street or risk the dangerous conditions of the shelter system (if the shelters will take them at all, as they are currently at capacity). Plaintiffs bring substantive claims under the First Amendment, the Fourth Amendment, the Fourteenth Amendment, the ADA, and the state-created danger causes of action.

## V.   <u>Relief</u>

Plaintiffs as the court to order injunctive relief in the form of an immediate Temporary Restraining Order, which cannot be violated unless and until the City 1) provides Plaintiffs with shelter which is safe, clean, individually separated and in compliance with CDC guidelines regarding the prevention of the spread of COVID-19, and 2) provides Plaintiffs including all residents at the Encampments with a clear path to permanent housing for which they can be held accountable, and temporary housing until such time at which they are able to provide permanent housing, and 3) provides specific protocol and procedures for the location, labeling, and easy reacquisition of Plaintiffs' property detained which will be held in storage in accordance with the due process requirements of the Fourth and Fourteenth Amendments. Additionally, Plaintiffs respectfully request that the Court set a hearing regarding a Preliminary Injunction.

## VI.   <u>Certification and Closing</u>

*Under Federal Rule of Civil Procedure* 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of *Rule* 11.

**A.  <u>For Parties Without an Attorney</u>**

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

BY:

Date:   8/17/2020

MICHAEL N. HUFF, ESQUIRE
Attorney I.D. No.:  72714
1333 Race Street
Philadelphia, PA 19107
(215) 567-2120
michael.huff.esq@gmail.com
ATTORNEY FOR PLAINTIFFS

# EXHIBIT A: Declaration of Plaintiff Dolores McFadden.

## DECLARATION OF PLAINTIFF DOLORES MCFADDEN, IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

DOLORES MCFADDEN, pursuant to 28 U.S.C. § 1746 hereby declares as follows:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The evidence set out in the foregoing Declaration is based on my personal knowledge.

2. I am Dolores McFadden, born 12/28/1972, and submit this Declaration in support of the Motion for Temporary Restraining Order and Preliminary Injunction.

3. TESTIMONIAL STATEMENT #1 is a true and correct copy of my Declaration.

### TESTIMONIAL STATEMENT #1

I have been in the shelters for three years. We were receiving bad medication, poison medication. It was also in our food. I know the FDA was called, sometimes our medication was bad. We had cyanide, ginseng, and lime. This medication they got from a pharmacy. It made me sick, lose weight, stomach was upset, incontinence, and frequent bowel movements. And when they were contacted they did nothing about it. Most of them, the buildings were not equipped. I don't know if they sent anybody in to see if everything was working, the conditions needed inspection but we don't have that. People die, there were deaths from the food they were eating. I think they should check the pharmacies now, CVS, Walgreens, the clinics where they were receiving medication to make sure everything is safe. The donations, I don't think they are federally inspected, people just donate them and they take it. They should make sure that it's safe and clean. I was blackballed in the shelter by a bunch of thugs. It took a long time to take them in.

They misappropriated funds, cleaned out people's bank accounts, they have all your information in the computer. They don't help you really find a home, they're not much help. That building over there should be open now. We're in tents here, but it's closed down. Trucks, vans are

parked. Nobody's in there. Where are we gonna get the help from? They've got a big new building. I don't see anybody going in, anybody coming out. One time before I left the shelter to live in New Jersey, the shelters were run by the state. Where are the funds? I know they're supposed to be sending it, but what's happening to it?

They put me on social security, I haven't received a dime. I tried to take it to the courts five times, they wouldn't hear it. What's wrong with the court system? I still haven't gotten a dime. I'm not being protected by the police. They're corrupt, the whole system, the district attorney's office, the prosecutor's office, the police districts. They can't find attorneys to go to court and take a sister's side. And minorities are disappearing.

When I was in Kirkbride, I got three meals a day but other people didn't get that, they had to go somewhere else. They cleaned your bank account out. You saved money for a place to live, most of the time you leave there, you're back in the shelter again. People that need checks are not eligible, they turn them down. Most of them are minorities – black, Hispanic.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 15, 2020.

_____

DOLORES MCFADDEN

# EXHIBIT B: Declaration of Witness Ebonie Camp.

## DECLARATION OF WITNESS EBONIE CAMP, IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

EBONIE CAMP, pursuant to 28 U.S.C. § 1746 hereby declares as follows:

1.  I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The evidence set out in the foregoing Declaration is based on my personal knowledge.

2.  I am Ebonie Camp, and submit this Declaration in support of the Motion for Temporary Restraining Order and Preliminary Injunction.

3.  TESTIMONIAL STATEMENT #1 is a true and correct copy of my Declaration.

### TESTIMONIAL STATEMENT #1

My daughters and I were residents at ACT Christian Transition Services Shelter from 1/12/2015 until May 12, 2016. We were in Eliza Shirley Family Shelter from September 2019-October 2019. We were at Eliza Shirley Shelter again from early September 2019-October 2019.

I went to Cherry Street Office of Supportive Intake first. At first, they told me they didn't have anywhere for me and my daughters to go. Every time you go to Intake, they make you bring your children with you, which is inconvenient, especially because the kids have school and I was working.

I had to come back, and eventually they told me they had room for me at Eliza Shirley. Some people stay there and go straight to their permanent housing, but I was in Eliza Shirley for a year or so before they found me some place to live.

At Eliza Shirley there are steps when you come in. I didn't see people in wheelchairs at Eliza Shirley. If you had a rolling wheelchair you can leave it at the entrance, but you had to take steps to get inside. They wouldn't allow the elevator. The same thing for ACT. For ACT they had steps, and nobody was in wheelchairs because they had a lot of steps, and the steps were too steep. They were very dangerous steps; I can say that.

I saw women with strollers, they had the baby in one hand and they would have the stroller in the other hand. I always said that was dangerous. They would sometimes have to leave the baby and make two trips up or down the stairs- one trip with the baby and one trip with the stroller. And I was very nervous about the children going up and own the steps because they were very steep. I was also nervous about the children being left at the top or bottom of the stairs.

Whenever you were in the shelter you don't have a room by yourself, and the rooms are never locked. It's not even locked when you are in the room for the night. My boyfriend bought me a Samsung tablet for me to communicate with my girls and for me apply for jobs. One night I went into the shower, the tablet the was on my bed. When I got out of the shower, the tablet was gone. I went to the administrators to tell them. They have staff that sit in the hallway. I reported it stollen to the staff, they took my report and I never heard anything again about it again. I never got it back.

They house people in the basement at ACT. When I was there the basement was really bad. That's where they put the mothers and babies. There was no ventilation and no windows. You have to stay downstairs in the dining hall all day if you have nowhere to go, and that is unsanitary. They have cots if your child wants to take a nap, but you can't go upstairs during the day. So, people would be packed down there in the basement. We had a room with a girl and a boy, me and my girls were on the other side. When that family left the shelter, another family came

in, and they shared a room with me. It was a woman with her preteen boys, and that was awkward. My daughters and I had no privacy. My daughters were also pre-teens. We would have to get dressed in the bathroom, the bathroom was not clean or sanitary.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 14, 2020.

s/ Ebonie Camp

_____

EBONIE CAMP.

# EXHIBIT C: Declaration of Plaintiff Maurice Scott

## <u>DECLARATION OF PLAINTIFF MAURICE SCOTT, IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>

MAURICE SCOTT, pursuant to 28 U.S.C. § 1746 hereby declares as follows:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The evidence set out in the foregoing Declaration is based on my personal knowledge.

2. I am Maurice Scott, and submit this Declaration in support of the Motion for Temporary Restraining Order and Preliminary Injunction.

3. TESTIMONIAL STATEMENT #1 is a true and correct copy of my Declaration.

### TESTIMONIAL STATEMENT #1

The shelters is a joke. I have never been in a shelter, but I've volunteered with a lot of them. Sunday Breakfast, Broad Street Ministry, and one at the old church on 6th and Race. A lot of the people there are not properly trained. You're dealing with all kinds of mentalities and attitudes, and a lot of the staff is just there to work 8 hours and go home. You have to know that some people can't help the situation they're in, and they want to be helpful. Volunteers say "I don't have to do nothing for you." At Station House, all staff do is give you a bunk, and that's it. They don't help you with anything else, they don't want to have anything to do with you. The staff doesn't help anyone with mental illness or drug problems. 70% of the staff is not trained. A lot of these shelters need more training, but they say they don't have enough money. That's why a lot of people don't want to go to shelters. One, it's not safe, and the other thing is they're not clean. You ask the staff to clean the showers and they say "I didn't do it, you clean it up."

I won't stay in a shelter because first of all, it's not safe. I've heard of people getting stabbed there. People steal your things and no one lets you file a report. Before I allow that to happen to me, to get beat up or hurt, or jumped by anyone, I don't put myself in that situation by choosing not to go there.

I heard that the city is taking our port-a-potties on Thursday. They canceled our contract with the private companies. That is more of a public health crisis than what we are doing here. You're telling me to pack up my stuff on the 17th but they're not telling me where to go. So I'm just going to go across the street and wait for another notice saying I have to move again.

The last time I was housed was in 2015. I was working in Camden at the time. I got a parole violation, did two years, came back home in 2018. I went to school for culinary arts. I was working again at Cathedral Kitchen in Camden, NJ. I graduated from their culinary arts school and their baking class. Really, they do everything. We fed the homeless and everything. But they tell you it's zero-tolerance. You have to allow them to curse at you and threaten you and you can't say anything back. I'm not on payroll, but I volunteer. I have eczema real bad, and I dislocated my shoulder and it never healed. I can work with it, but it hurts a lot. My eczema gets so bad that in the heat, my skin peels. I used to be on payroll there, but I decided to stop working myself because of these problems. I applied for welfare, and they told me I could only get 16 dollars a month. I'm able to work, but I can't work for so long because I never know when my health problems will flare up again. I do odd jobs whenever they call me.

I put in for low-income housing in Philadelphia in 2016. They told me that the waiting list has been closed since 2013, but she just took down my name. I'm not officially on the list. There won't be no list after 2013. I've been living on the streets since 2018 when I got out of jail.

I've been tested for COVID so many times here at the camp. When people donate, I bring stuff to their cars. I eat sometimes here, but sometimes not. I'd rather those who need it to have the food, and I don't always need it. It is a better situation with the shelters because majority of the shelters you have to leave no later than 7am. If you get a job, you have to get permission to come back by curfew. If you get a job, they'll tell you they're not responsible for your stuff. People have went to work and come back and someone took their shoes, the quilt off their bed, everything. You put a lock on things and people break the locks. Staff doesn't know nothing because they say they "can't be everywhere at all times." People feel that if they tell on others, they're going to get beat up and  their stuff stolen. I feel the shelters should be a temporary thing, and it shouldn't take no more than 30 days for people to get into other housing. I really don't see this site as no problem. It was barely used. We could go camp out at city hall or Love Park, but this place is less used than any other places. I would be a nuisance if I went to a place that was being used. They don't use none of this property here. The memo made me mad because it said we didn't get permission to camp out. I don't remember growing up when I went to the park that I ever had to get permission. This is something new that y'all came up with because it's many people who are fighting for a cause. Instead of fighting with us, they should be helping us. We're helping the city save money and avoid major lawsuits.

_____

MAURICE SCOTT

# EXHIBIT D: Declaration of Plaintiff Faith Anne Burdick.

## DECLARATION OF PLAINTIFF FAITH ANNE BURDICK, IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

FAITH ANNE BURDICK, pursuant to 28 U.S.C. § 1746 hereby declares as follows:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The evidence set out in the foregoing Declaration is based on my personal knowledge.

2. I am Faith Anne Burdick, and submit this Declaration in support of the Motion for Temporary Restraining Order and Preliminary Injunction.

3. TESTIMONIAL STATEMENT #1 is a true and correct copy of my Declaration.

## TESTIMONIAL STATEMENT #1

I've had two horrible experiences with PHA. The first one was worse than the last one because I had all my kids with me. I had cancer and I had all my kids with me, I really needed somewhere to go. The first time they told me I didn't qualify, like, I'm really really really sick and I have kids and I'm not qualified? They said it was because of a tax return of a person I used to live with, and they said no, you've got too much income. I was sick as hell, I had all my kids, and I needed a nurse.

The second time was just this past winter. I had just gotten out of Presbetyrian hospital. I had two episodes of cardiac arrest, I woke up with a tube in my throat intubated. They said I had coded out twice in one night, and I was in the ICU for a few days. I have Long Q T syndrome, a hereditary condition where the electricity in your heart is wrong and so your heart can be too fast, too slow, or stop entirely. I got discharged from the hospital and they told me again that I didn't qualify because he filed with me on his taxes again. I ended up getting raped, robbed, had a gun pulled on me. I've had so much shit happen with these motherfuckers. I can't stand and yell at them because it's so hot out and my heart is racing. I want everyone to know what these motherfuckers do. It's a whole bunch of fucking nothing. They're helping the wrong people. I'm too

sick to be out here. Besides that, people shouldn't be living in tents. You've got all this money but somehow we're sweating to death. We shouldn't have to live like this.

The first time I needed help, my kids had to go live with their dad. So not only was I homeless, but I didn't have my kids. I devoted my life to my children and I had to give them up because I had nowhere to put them, no way to feed them. My son Michael is so depressed because he's so close to me, and none of us knew how to handle it. I was actually sober for five years and then my kids were gone, and it was like a free-for-all, I started drinking again. You have nowhere to go, you lose your kids and your animals, and then you don't give a fuck. I was stone cold sober for five years and I said fuck it. You have nowhere to go, no water, and you can't take your kids with you. I went to every agency in the city and got nothing. You put a recovering alcoholic in that situation, what do you expect them to do? The sound of silence is deadly painful. I'm sorry I'm saying so much, but you need to know what these people have put people through. They really really really fuck up people's lives, to the point that you don't know if you're gonna ever recover.

Yesterday the cops came by and said something about us spreading around corona, but I've been tested four times. I take a long time to wake up, and when I came out they said they had corona. They came out here saying we don't wear masks, we don't do this, that, and the other, but not one of those motherfuckers had a mask on. I fall asleep with my shit on, just in case some shit goes down. My opinion totally is that Philadelphia doesn't give a fuck about homeless people and they want us to kill ourselves off. Put that in there and make that public. They want us all to go away because they want to do gentrification to the entire city.

FAITH ANNE BURDICK

# EXHIBIT E: Declaration of Witness Joseph Tucker.

## DECLARATION OF WITNESS JOSEPH TUCKER, IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

JOSEPH TUCKER, pursuant to 28 U.S.C. § 1746 hereby declares as follows:

1.  I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The evidence set out in the foregoing Declaration is based on my personal knowledge.

2.  I am Joseph Tucker, and submit this Declaration in support of the Motion for Temporary Restraining Order and Preliminary Injunction.

3.  TESTIMONIAL STATEMENT #1 is a true and correct copy of my Declaration.

### TESTIMONIAL STATEMENT #1

I was just released from county incarceration for a violation of my probation back in the end of February. I wasn't placed into the shelter until the second week of March. I've been there before, it wasn't my first time being there. Just to be fair in good faith, I'll say the conditions were fair. Generally, there was food poisoning, the conditions of the toilet rooms and the showers were very deplorable. What made matters worse is that although there were staff even prior to coronavirus who could have contributed in some way to implement improvements to a lot of the issues that I brought up even prior to the COVID-19 epidemic. They still chose to do things the way they wanted to. I wasn't the only one that made complains verbally. They pretty much fell on deaf ears, and they basically said we do things the way we want, and if you don't like it you can get out.

When the COVID-19 epidemic hit, and they visited, the staff were the first to get it, two of the staff got it. They went into a general quarantine, and this is where it was generally botched. Any type of quarantine in regards to anyone, whether industrial, correctional, retail, no matter the issue, if you have someone who tests positive within your staff or entourage, they're supposed to go self-quarantine. Not only was that staff member supposed to self-quarantine, but the whole

facility was group-quarantined by floor. Everyone was confined to their room with their room-mates, regardless of who had it or not. We were let out for fifteen minutes every four hours for a smoke break or whatever we wanted. This facility was the Center for Hope in Carlisle. So this is from April 24th to May 18th or 19th, give or take a day.

But as I said, their general quarantine was, they were allowing us in and out of the building in specific pairs. It didn't get into what I described until they did what was called specific quarantine, when they were receiving more and more positives, more residents were becoming positive. So as a result, they just quarantined us off by floors. I decided to go and get tested and ended up finding out I was positive. That's what prompted me to file a grievance against them with the shelter's administration. They gave me their results which were basically, go kick rocks, go do you. Then I went and filed a grievance with the parent company, Urban Affairs Coalition of Philadelphia. I'm not saying they did anything negative, I filed a grievance in good faith and gave some demands to them. They didn't meet any of my demands but they came down there and gave them some barking orders, basically. The result of my grievance was I was subjected to retribution. I was subjected to a health and safety discharge for violating the cardinal rules of the shelter, for having a two inch knife blade. This was over Memorial Day weekend.

If I'm not mistaken, within the policies and regulations, nobody is supposed to be given a health and safety discharge unless it was a serious infraction. This was my first infraction and I wasn't given a warning. It wasn't serious if the blade wasn't being used in an altercation or a fight, which would've made it a serious violation, but they just found it when they looked through my stuff. That being said, now I go to 2601 which is Station house, the city's emergency shelter for men, where you can go 24/7, because I'm registered under that address because I'm a convicted and registered sex offender. I've never really resided there, I've spent a night or two there. The staff are competent as well as complemental, they're strict and stern about their business but they treat you with decorum as long as you give them proper consideration. It's a shame I can never get assigned to reside there.

If you messed up your protocols to protect and preserve the integrities of our health, at this facility that your staff is supposed to be competently running, who's to say that it won't continue to happen? And that's what angered me, because it's not like only the staff caught it, but residents started catching it left and right, and you did nothing about it, like "oh well, let them drop like flies." You only care about your staff, you don't care about quarantining us. Our food portions, you see the little cereal cups they give us here? Those are small portions. We only got two of the little bowls and a 8oz carton of milk for breakfast. You were lucky if you got a piece of fruit. Our

lunch was generally a sandwich with two slices of lunchmeat that you could take and put some mustard on it if you wanted to, not that it would help. And maybe a bowl of soup. Generally 5 days a week. The dinner was the only meal that seemed to come to be a full course meal.

Beside the food issues, the issues relating to the uncleanliness of the toilet rooms and showers, where you have staff there that are facilitating the building, every day Monday through Friday 8 hours a day but doing nothing. We would be lucky if our bathrooms and showers got cleaned once a week. When I had my phone I took pictures of the mold that had accumulated in the showers. It takes time for mold to accumulate, so that mold had to have been there for almost a year. When these issues were brought up, I was pretty much given a door shut until I went to the parent company. That's when they started jumping on the ball, but there are things they really couldn't take care of.

In regard to my plight, I would like to find an attorney that can do research to see if I have grounds to file a tort action against the facility and its parent company. Not to find that they didn't correct it, which I'm sure they did, but that they allowed it to continue to happen even after I filed the complaint. There's nothing you can do to remedy the hurt that's been done to me, that's a personal damage done by their hand. My problem is that I don't have a phone. I had one but the job that I was working, which I had to leave unfortunately because of my hernia condition, the phone literally got sweated out. I worked in a bread baking factory, and the conditions were so humid that every day when I left my shift, I could take my clothes off and wring them out from all the sweat. I had to take two sets of clothes to work to change, so that messed my phone up so I don't have a phone.

They need to step up their efforts with the production of resources and services that they're given control to issue out. I've been to the same shelter over the past four years and regardless of the period of time I've been there, and regardless of my efforts to secure the resources that I requested from them, I always end up being discharged on a negative issue prior to receiving any services. There are services, like rapid housing, is usually supposed to take five months. The majority of the time I've spent at the aforementioned shelter, I always end up being at the shelter for six months or more, always resulting, with the exception of one time when I discharged myself upon being able to secure a residence with my prior fiancée/ex-girlfriend.

Other than that, the staff seemed to be lacking in their decorum concerning their professionalism with executing their positions. I believe that the Urban Coalition should execute a specific clandestine operation to utilize an undercover agent, A.K.A. a homeless resident, to arrange through the Office of Homeless Services to send the agent, A.K.A. a homeless resident with a purchase

of services attending CFH-Carlisle, and upon them having the 30-day P.O.S. at CFH- Carlisle, his job would be to observe and experience the conditions, operations, and interactions of the staff at the facility for collection of viable evidence to corroborate the charges. Basically meaning to assent its truthfulness of the tort claim.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 15, 2020.

_____

JOSEPH TUCKER

# Exhibit F: COVID Testing Results from Philadelphia FIGHT Community Health Center.

---------- Forwarded message ---------
From: **Kimberly Chiaramonte** <kchiaramonte@fight.org>
Date: Mon, Jul 13, 2020 at 10:06 AM
Subject: COVID-19 camp data
To: Sterling Johnson <sterling.k.johnson@gmail.com>

Demographics –

| total | Hispanic | Not Hispanic | Total |
|---|---|---|---|
| Asian | 0 | 1 | 1 |
| Native Hawaiian/Other Pacific Islander | 0 | 0 | 0 |
| Black/African American | 2 | 19 | 21 |
| American Indian/Alaska Native | 0 | 0 | 0 |
| White | 1 | 5 | 6 |
| More than one race | 1 | 1 | 2 |
| Unreported/refused to report | 2 | 19 | 21 |
| **Total** | **6** | **45** | **51** |

|   | 25 and under |
|---|---|
| 4 | |
| 9 | 26-35 |
| 9 | 36-45 |
| 13 | 46-55 |
| 5 | 56-65 |
| 1 | 65 and over |
| 1 | over |

50 total tested
49 negative
1 positive (self-quarantined)

26 male
15 female
1 trans
13 declined

Many reported BSM 315 S Broad as a mailing address
Only one we spoke to was not connected to any services however had just been released from incarceration – but not from Philly – from Baltimore. Had one connection to ICJ here at FIGHT.

**Kimberly Chiaramonte, MSS, LSW** ~ Broad Street Ministry Program Manager ~ Philadelphia FIGHT Community Health Centers

Call or text: 267-671-2761

Important: This e-mail message and any attachments is intended for the exclusive use of the recipient(s) named above. It may contain information that is protected, privileged, or confidential, and it should not be disseminated, distributed, or copied to persons not authorized to receive such information. If you are not the intended recipient, any dissemination, distribution, or copying is strictly prohibited. If you think you have received this e-mail message in error, please notify the sender immediately.



**EXHIBIT G: Email from Witness Jennifer Bennetch**.

## EXHIBIT H: "First Notice"



# EXHIBIT I: "Second Notice"





# EXHIBIT J: "Third Notice"





# SECOND NOTICE

You are not authorized to use Von Colln Playground and Field, the Azalea Garden, any portion of the Benjamin Franklin Parkway, or other Fairmount Park property in the City of Philadelphia (hereinafter, collectively, "Fairmount Park Property") to erect a tent or other structure, or to otherwise encamp or stay, at this location. The conditions violate Philadelphia Code Title 4 (Property Maintenance, Administrative, and Fire Codes); Philadelphia Code §§ 6-205, 6-206, 10-615, 15-601, and 15-604; the regulations governing the Fairmount Park system, and the Mayor and Board of Health's Emergency Orders and Regulations Governing the Control and Prevention of COVID-19. Since mid-June, you have been repeatedly warned that you cannot occupy Fairmount Park property with tents and other structures. In addition, on July 10, 2020, this property was posted with a notice directing you to remove your possessions and leave this area by no later than July 17, 2020.

The individuals currently occupying Fairmount Park Property have expressed the intention to use Fairmount Park Property for long-term outdoor living, for a vulnerable population. Fairmount Park Property is zoned as SP-PO-A, which does not allow for it to be used for long-term outdoor living for a vulnerable population. *See* Phila. Code §§ 14-407 and 14-602(6). In addition, living facilities for vulnerable populations must meet stringent Building Code, Fire Code, and other licensing requirements prior to opening. *See* Phila. Code Titles 4, 6, 9, and 14.

There has been consistent unlawful drug use in the encampments. There has been at least one overdose death in the encampment. If drugs are used intravenously, it can lead to infection at the injection site, transmittal of communicable diseases among users, and the spread of disease to the general public. In addition, it has been observed that occupants of the encampment have been using a drug commonly known as K-2. When a person uses K-2, they experience severe cognitive, behavioral, and physical symptoms including exhibiting violent behavior, increased heart rate and other cardiovascular symptoms, exhibiting disorientation and suicidal tendencies, and experiencing severe, repeated vomiting. Repeated vomiting can lead to asphyxiation and/or dehydration, an especially serious condition given the severe heat that Philadelphia is presently experiencing.

Drug use, which can result in overdoses, also increases the need for first responders to go to the premises, putting those first responders at risk. In fact, between June 25 and July 29, 2020 there have been 21 calls for emergency services, inclusive of calls responding to complaints of overdose and symptoms of overdose.

Drug sales are linked to violence and risk of injury or death, including injury or death to community members who are not involved in drug use or sales. The increased risk of violence has additional injurious effects on the entire neighborhood, including children.

In fact, there were two separate stabbing incidents near the encampment; both incidents remain under investigation. In the first incident, the victim, who was stabbed multiple times, was a resident of the encampment; that victim was in critical condition when initially in the hospital. In the second incident, the assailant is an individual who is experiencing homelessness. These incidents of extreme violence are troubling on their own, but they are particularly troubling in light

**WRITTEN NOTICE FIRST DISTRIBUTED ON: July 10, 2020**
**WRITTEN NOTICE RE-DISTRIBUTED ON: August 17, 2020**

**EXHIBIT K: Fourth Notice**

You must remove your property and leave this location as soon as possible but by no later than **AUGUST 18, 2020 AT 9:00 A.M.** Personal property and debris remaining at this location will be removed by the City of Philadelphia on **AUGUST 18, 2020 at 9:00 A.M.**

Personal property, as designated by the City of Philadelphia, will be stored by the City for no more than 30 days. All stored personal property not retrieved within 30 days will be considered abandoned and will be disposed of permanently. Debris and property deemed a hazard to the public health, safety, or welfare will be destroyed immediately.

Examples of personal property and examples of debris are as follows:

| PERSONAL PROPERTY | DEBRIS |
|---|---|
| • Tents | • Unsanitary or infested clothing, bedding, or tents and other items determined by the City to be a threat to public and/or municipal workers' health, safety, or welfare |
| • Stoves and grills | |
| • Pots, pans, and cooking utensils | |
| • Medicine | • Newspapers and cardboard |
| • Sleeping bags and blankets (must be sanitary and not infested) | • Loose paper and plastic debris |
| | • Food or other perishable items |
| • Clothing (must be sanitary and not infested) | • Garbage |
| • Backpacks | • Empty cans and bottles |
| • Hand-held tools | • Scrap metal |
| • Personal transport device | • Drug paraphernalia |
| • Vital documents, files, and folders | • Shopping Carts |

If you would like to seek assistance from the City of Philadelphia in finding alternative shelter, medical assistance, or other treatment, please call: **Homeless Outreach anytime at 215-232-1984 or the Department of Behavioral Health and Intellectual disAbility Services member hotline at 888-545-2600. If you do not have access to a telephone, you may reach the City by going to 1430 Cherry Street or 804 North Broad Street, Monday-Friday, 7AM -5PM.**

*WRITTEN NOTICE FIRST DISTRIBUTED ON:* July 10, 2020
*WRITTEN NOTICE RE-DISTRIBUTED ON:* August 17, 2020