UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

IRVIN MURRAY, MAURICE SCOTT
DOLORES MCFADDEN, FAITH ANNE
BURDICK, EDWIN JONES, And ALL OTHER
HOMELESS RESIDENTS OF THE
ENCAMPMENTS AT VON COLLN FIELD,
JEFFERSON AND RIDGE, and the AZALEA
GARDENS

                    Plaintiffs,

    v.

THE CITY OF PHILADELPHIA and
MAYOR JAMES KENNEY,

                    Defendants.

2020 AUG 17 P 5: 08

USDC-EDPA
CLERK

CIVIL ACTION NO:

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiffs Irvin Murray, Maurice Scott, Dolores McFadden, Faith Anne Burdick, Edwin

Jones, and Other homeless residents of the encampments at Von Colln Field, Jefferson and

Ridge, and the Azalea Gardens, (together, the "Plaintiffs"), hereby file this Memorandum of Law

in support of their Motion for Temporary Restraining Order and Preliminary Injunction against

Defendants The City of Philadelphia and its agents, employees, subdivisions, contractors and

assigns, and Mayor Jim Kenney (together, the "Defendants"), to enjoin Defendants from taking

any action to disperse, relocate, or destroy the homeless encampment protests at Von Colln

Field, Jefferson and Ridge, and the Azalea Gardens (together, the "Encampments") or assisting

1

or ordering anyone else to do so, unless and until the City: (1) provides Plaintiffs with shelter which is safe, clean, individually separated and in compliance with CDC guidelines regarding the prevention of the spread of COVID-19, and (2) provides Plaintiffs including all residents at the Encampments with a clear path to permanent housing for which Defendants can be held accountable, and temporary housing until such time at which they are able to provide permanent housing, a time period which must be reasonable under the circumstances and not exceed one year, and (3) provide specific protocol and procedures for the location, labeling, and easy re-acquisition of Plaintiffs' property to be detained, which will be held in storage in accordance with the due process requirements of the Fourth and Fourteenth Amendments.

## I.      <u>INTRODUCTION</u>

The homelessness crisis is rampant and escalating in Philadelphia. The 2019 Philadelphia Office of Homeless Services' Point-In-Time (PIT) count describes the number of chronically homeless people in Philadelphia as having "increased dramatically." (Philadelphia Office of Homeless Services, "Methodology for PA-500 Philadelphia.") In 2018, the total number of homeless Philadelphians was 5,788. (Philadelphia Office of Homeless Services, Philadelphia Annual Point-In-Time count, 1/24/2018). Of those 5,788 individuals, 4,364 individuals are Black Philadelphians.

The situation in which Plaintiffs now find themselves began in Kensington in 2018, when the Encampment Resolution Pilot Project was created by Defendants to dissolve homeless encampments in Philadelphia. Since the Pilot Project was created, multiple encampments in Philadelphia have been dissolved without providing adequate shelter to the individuals residing therein. These individuals, which include Plaintiffs in this case, have been shuffled from place to place, creating communities only to see them destroyed by Defendants. Most recently, several

Plaintiffs were residing at an encampment at the Philadelphia Airport, and still more were resid-
residing in an encampment underneath the Convention Center. These encampments were
dissolved in January, and clearly Defendants have not provided them with adequate alternatives
because they are here once again living in encampments at 22nd Street and Benjamin Franklin
Parkway and at the PHA Headquarters at Jefferson and Ridge.

The waiting list for permanent low-income housing has been closed since 2013. Those
lucky enough to get on the waiting list prior to 2013 report waiting seven years or more on the
list for an opportunity for housing stability that has never come. While they wait, they are
relegated to Philadelphia's shelter system. The shelter system is completely full. Moreover, it
was dangerous and unsanitary before COVID-19, and is an even greater threat to public health
and safety during COVID-19 as they are in egregious noncompliance with CDC guidelines and
the Mayoral Order regarding COVID-19.

Prior to COVID-19, Plaintiffs and Witnesses who entered the shelter system testify that
the shelters are dirty, mold-infested, overcrowded, and dangerous. Plaintiffs report being served
poisoned and spoiled food (**Exhibit A**, Declaration of Plaintiff Dolores McFadden), that the
shelters are not ADA compliant because of stairs and other obstacles (**Exhibit B**, Declaration of
Witness Ebonie Camp), that they kick people out at unreasonable times and refuse to let people
in who are late to the curfew because they have jobs which render them unable to make it there
by curfew (and end up losing their jobs as a result), and notably many Plaintiffs have been barred
from the shelters altogether because they have made complaints regarding unsanitary and
dangerous shelter conditions. (**Exhibit C**, Declaration of Plaintiff Maurice Scott; **Exhibit E**,
Declaration of Witness Joseph Tucker.). Plaintiffs also report criminal abuse and conversion of
property by the shelters, including vital medications, stealing money from residents, physical

violence without redress, and people doing drugs in the shelters with impunity. (**Exhibit A**, Dec-Declaration of Plaintiff Dolores McFadden; **Exhibit C,** Declaration of Plaintiff Maurice Scott.)

Since COVID-19, Witnesses report that shelters "botched" self-quarantine procedures, group-quarantining shelters by floor and confining them with individuals with active COVID-19 symptoms, which in turn led to the rampant spread of COVID-19 in shelters across Philadelphia. (See **Exhibit E**, Declaration of Witness Joseph Tucker.) Notably, at Philadelphia's largest men's shelter, over 50% of residents and staff have tested positive for COVID-19. (*Kensington Voice*, "at Philly's largest men's shelter, more than half of guests and staff test positive for COVID-19", published May 11, 2020.) After Defendants dissolved the encampment at the Convention Center on or about March 24th, 2020, the residents of this encampment were put into the shelter system. (*The Philadelphia Inquirer,* "A Covid outbreak and a death at a Philadelphia homeless shelter after the city broke up encampment at Convention Center", updated May 1, 2020.)  10 days later, 36 residents and employees tested positive for COVID-19 in that same shelter, and one former resident at the Convention Center who was moved to the shelter subsequently died of COVID-19. *Id.* Defendants have themselves admitted that there were eight outbreaks of COVID-19 as of April 2, 2020, with at least 50 residents contracting the disease. *Id.*

There has been a steady increase of encampments in the United States as a whole. The U.S. Department of Housing and Development explains that  "Researchers generally agree that increases in homelessness are first and foremost the result of severe shortages of affordable housing, combined with a lack of political will to dedicate sufficient resources to address this problem…Encampments form in response to the absence of other, desirable options for shelter. (U.S. Department of Housing and Urban Development, "Understanding Encampments of People Experiencing Homelessness and Community Responses", January 7, 2019.) The rise of current

encampments, especially encampments which consider themselves to be protests, is connected to

the COVID-19 pandemic and the national movement for the rights of Black Americans. As

evidenced by the fact that over 75% of homeless Philadelphians are Black or African-American,

homelessness is an issue which majorly impacts the Black community and is directly tied to the

movement for the rights of Black Americans. (Philadelphia Office of Homeless Services,

Philadelphia Annual Point-In-Time count, 1/24/2018) There are 5,788 homeless Philadelphians,

and 40,000 vacant properties in Philadelphia. (Arcgis Philadelphia Vacant Property Indicators

Viewer). Defendants could easily fix these properties, or give Plaintiffs money to fix them

themselves, but instead they choose to leave these properties vacant and deteriorating.

## II.        STATEMENT OF RELEVANT FACTS

The encampments on 22nd and Benjamin Franklin Parkway and at Jefferson and Ridge

(hereafter the "Encampments) were constructed around two months ago, with the assistance of

the Workers' Revolutionary Collective and Occupy PHA. The encampment at Azalea Gardens

was constructed around one month ago. Plaintiffs have always maintained that these

encampments are protests for permanent housing and Black Lives Matter, as the vast majority of

residents are homeless Black Philadelphians, many disabled, and some families with children. In

stark contrast to shelter conditions, the Encampments socially distance and individually house

residents in tents at least six feet apart. They provide necessary services to residents such as

unadulterated and safe meals, tents, clean clothing, masks and hand sanitizer, medical and

hygienic supplies, and a medic on site 24/7. Plaintiffs report being tested multiple times for

COVID-19 at the Encampments. (See **Exhibit C,** Declaration of Plaintiff Maurice Scott; **Exhibit

D,** Declaration of Plaintiff Faith Anne Burdick).  The FIGHT Community Health Center

conducts this testing, and it is alleged that on-site medics have conducted testing as well. Only

one resident has ever tested positive, and she was individually quarantined, successfully stopping

the spread of COVID-19 in the Encampments. (See **Exhibit F**: COVID Testing Results from

Philadelphia FIGHT Community Health Center.) Despite these test results, Defendants have

provided incorrect statements to Plaintiffs and others about how encampments are fostering the

spread of COVID-19, when in reality it is Defendants' own shelter system that is causing the

disease to spread rampantly throughout the homeless community.

In March, a day before Defendants dissolved the encampment at the Convention Center,

the U.S. Center for Disease Control and Prevention issued Guidance stating the following: "If

individual housing options are not available, allow people who are living unsheltered or in

encampments to remain where they are. Clearing encampments can cause people to disperse

throughout the community and break connections with service providers. This increases the

potential for infectious disease spread…Work together with community coalition members to

improve sanitation in encampments. Ensure nearby restroom facilities have functional water

taps, are stocked with hand hygiene materials (soap, drying materials) and bath tissue, and

remain open to people experiencing homelessness 24 hours per day. If toilets or hand-washing

facilities are not available nearby, assist with providing access to portable latrines with hand-

washing facilities for encampments of more than 10 people. " (*Centers for Disease Control and

Prevention,* "Interim Guidance on Unsheltered Homelessness and Coronavirus Disease 2019

(COVID-19) for Homeless Service Providers and Local Officials.) Defendants' actions both then

and now are in direct violation of this CDC Guidance. As previously stated, Defendants have

cleared multiple encampments since the start of the COVID-19 outbreak. And on Tuesday, July

14th, 2020, Defendants unilaterally canceled the Encampments' pre-paid contract with their

portable toilet provider, and told the provider that if they did not remove these toilets on

Thursday, July 16, 2020, that the provider and the Encampments would be fined approximately $750 per portable toilet remaining at the Encampments. (**Exhibit H**, Email from Witness Jennifer Bennetch). This is clearly in direct conflict with the aforementioned CDC Guidelines.

On June 10th, 2020, Defendants served a Notice upon the encampment (hereby "First Notice") at 22nd Street and Benjamin Franklin Parkway, stating that "the City has not authorized [use of] this property to erect a tent or other structure, or otherwise camp, at this location. The conditions pose a hazard to the life, health, safety, and welfare of the individuals in the tents, the nearby residents, and the public at large. You must remove your property and leave this location as soon as possible but no later than July 17, 2020 at 9:00 a.m. If you do not leave this location and remove your personal property by July 17, 2020 at 9:00 a.m., you will be issued a citation by the City of Philadelphia for violating the Philadelphia Code under Titles 4, 6, 9, 10, 14, and 15, Fairmount Park's Regulations, and the Mayor and Board of Health's Emergency Orders and Regulations Governing the Control and Prevention of COVID-19. Personal property and debris remaining at this location will be removed by the City of Philadelphia on July 19, 2020 at 9:00 a.m. No extensions will be granted. Personal property, as designated by the City of Philadelphia, will be stored by the City for no more than 30 days. All stored personal property not retrieved within 30 days will be considered abandoned and will be disposed of permanently. Debris and property deemed a threat to the public health, safety, and welfare will be destroyed immediately." (See **Exhibit I** "First Notice.") The notice provided no guidelines as to what was considered personal property versus debris, what personal property would be deemed a threat to public health, and where their property would be stored and how residents would be able to retrieve it.

The next day, Defendants served the very same notice on the encampment at PHA Head-quarters, The day after, Defendants delivered a document (**Exhibit J**, "Second Notice") stating that the encampment is "preventing imminent redevelopment of the property. PHA and its contractor will soon close on a project to construct the only supermarket in the Blumberg/Sharswood neighborhood…the presence of the illegal encampment threatens to block the supermarket project and the commencement of construction on the site…You must leave this location as soon as possible but by no later than July 17, 2020 at 10:00 a.m. Personal property will be stored by PHA for no more than 30 days. All stored property not retrieved within 30 days will be considered abandoned and will be disposed of permanently. Debris and personal property deemed a hazard to the public health, safety, or welfare will be destroyed immediately." *Id.* The notice goes on to provide a non-comprehensive list of "examples of personal properties and examples of debris." On the personal property side, tents, sleeping bags and blankets and clothing "(must be sanitary and un-infested)" are listed. *Id.* On the debris side, "unsanitary or infested" clothing, bedding, and tents are listed. *Id.* On the personal property side, "vital documents, files and folders" is listed. On the debris side, "newspapers and loose papers" are listed. Id. Food is listed on the debris side, as well as "other items determined by PHA to be a threat to public and/or municipal workers' health, safety, and or welfare." *Id.*

On Tuesday, another Notice was posted at an encampment at Azalea Gardens stating the exact same thing as the two previous notices, but with more information (**Exhibit K** "Third Notice.") This Notice was not served on either the encampment on 22nd Street and Benjamin Franklin Parkway, nor the encampment at Jefferson and Ridge. The Notice states that "Fairmount Park Property is zoned as SP-PO-A, which does not allow for it to be used for long-term outdoor living for a vulnerable population … As revealed by the overdose death at the

encampment on Von Colln Field, there has been unlawful drug use in the encampments. Drugs can lead to infection at the injection site, transmittal of communicable diseases among users, and the spread of disease to the general public. Drug use, which can result in overdoses, also increases the need for first responders to go to the premises, putting those first responders at risk. Drug sales are linked to violence and risk of injury or death, including injury or death to community members who are not involved in drug use or sales. The increased risk of violence has additional injurious facts on the entire neighborhood, including children. In fact, there were two separate stabbing incidents near the encampment; both incidents remain under investigation. In the first incident the victim, who was stabbed multiple times, was a resident of the encampment; as last reported, this victim remains in critical condition. In the second incident, the assailant is an individual who is experiencing homelessness. These incidents of extreme violence are troubling on their own, but are particularly troubling in the light of the apparent intent to invite children to the encampment as evidenced by the establishment and maintenance of a children's play area. The conditions at the encampment are unsanitary, lacking any running water, which means there are inadequate hand-washing, restroom, and other washing facilities. Siphoning off water from a City water fountain is neither a lawful or appropriate source of running water. Neighbors and nearby businesses have reported that they are now seeing feces in parking lots and other public spaces throughout the area… Regular hand-washing, social distancing, and routine mask wearing are necessary to reduce the risk of the spread of COVID-19. Residents of the encampment are using dirty and soiled bed linens. Dirty and soiled bed linens contain allergens such as dust mites, pet dander, mold, and bacteria. Allergens and like irritants can trigger skin conditions, asthmatic reactions, difficulty breathing, trouble sleeping…and transmission of communicable diseases…Allowing individuals from different

households to encamp, without appropriate social distancing and other health safety measures, and in excess of the social restrictions on gatherings, can cause COVID-19 to spread….There are inadequate food safety precautions which could lead to the outbreak of a food borne illness. Further, the use of grills and over cooking appliances in an area with densely packed tents, which are highly flammable, and surrounded by vegetation, presents a significant fire risk. The unlawful utility hook-up elevates the risk of fire. The continued use of Fairmount Park Property is damaging the land, trees, vegetation, and other Fairmount Park Property that the city holds and maintains for the use and enjoyment of the general public." *Id.* The Notice goes on to repeat points articulated in the previous Notices. *Id*.

Finally, the document which led to this emergency filing was served upon Organizer Sterling Johnson. (see **Exhibit K**, "Fourth Notice"). This Notice reiterated the exact same language from the previous Notices, except that there is a paragraph added about extreme weather conditions. This paragraph reads: "By remaining in this encampment, the occupants are at grave risk of being killed or injured by severe weather events such as hurricanes and tropical storms. High winds can topple trees and produce deadly flying debris. Heavy rains can produce flash floods. Lying and/or sitting on the ground in tents, that are close together, during a weather event exponentially increases the risk that one or more encampment occupants could be struck by lightning and/or electrocuted. That risk is further increased by the presence of the unlawful utility and water hookups, both of which are excellent conductors of electricity. In fact, since this encampment was erected, Tropical Storm Isaias struck Philadelphia and caused heavy flooding throughout and around the portions of the Fairmount Park Property that the encampment occupies. In light of the fact that scientists are calling for an "extremely active 2020 Atlantic Hurricane Season," it is profoundly dangerous for anyone to remain in the encampment." *Id.*

Plaintiffs fear the destruction of their encampment communities, which are safer, more sanitary, and provide more support than the shelter conditions proffered by Defendants. Plaintiffs fear the detention of all the property they have in the world at an undisclosed location and destruction of their property if Defendants decide it is hazardous to public health. Defendants have given Plaintiffs essentially no other options for safe residing; the shelters are full, and dangerously noncompliant with COVID-19 guidelines. Most importantly, Plaintiffs recognize that Defendants have not even attempted to provide them with a clear and accountable path to permanent housing. The list for permanent housing has been closed since 2013. Defendants have allegedly offered temporary stays in hotel rooms to residents of the Encampments, but there have been no reports of anyone getting into these hotel rooms yet. No vouchers or information has been provided to Plaintiffs about how to get into these hotel rooms, or information about what will happen to them or where they will go when their encampment is destroyed on Tuesday. Moreover, Plaintiffs express concern that being moved from their shelter-in-place to the hotel rooms temporarily without any of their belongings, and then eventually getting cast out of these hotel rooms with nowhere else to go and none of their property, will only perpetuate the pervasive practice of being unsheltered that they have experienced throughout their lives and will only serve to put them at increased risk of COVID-19 because of being frequently moved around to various locations. Plaintiffs have nowhere else to go, and have not been offered any viable path to permanent housing. And every day, Plaintiffs stare down 40,000 vacant properties, many owned by the Housing Authority, as they wait for years on lists for public housing.

### III.   ARGUMENT

**A.**   **Legal Standard**

The legal standard for a temporary restraining order is the same as that of a preliminary injunction. When evaluating a motion for preliminary injunctive relief, a court considers four factors: (1) has the moving party established a reasonable likelihood of success on the merits (which need not be more likely than not); (2) is the movant more likely than not to suffer irreparable harm in the absence of preliminary relief; (3) does the balance of equities tip in its favor; and (4) is an injunction in the public interest? *Fulton v. City of Philadelphia,* 922 F.3d 140, 143, 152 (3d. Cir. 2019). "If a plaintiff meets the first two requirements, the district court determines in its sound discretion whether all four factors, taken together, balance in favor of granting the relief sought." *Id*. Plaintiffs satisfy all of these elements and therefore Defendants should be immediately enjoined from taking any action to disperse, relocate, or destroy the Encampments or direct or order anyone else to do so.

Should the court deny Plaintiffs' request, Defendants will certainly destroy their residences on Tuesday, August 18, 2020 at 9:00 a.m. as per the Notices served to the respective Encampments. (**Exhibits** "First Notice," "Second Notice," "Third Notice," "Fourth Notice.") Defendants have stated that they will hold some of Plaintiffs' belongings in an undisclosed storage location, and destroy all other belongings that they believe to be unsanitary or a public health threat. *Id*. Although Defendants have released a short list of examples of which types of property will be destroyed and which will be kept, they have not disclosed the location where Plaintiffs' belongings will be kept or the manner in which Plaintiffs will be able to recover their property, and have not stated with sufficient particularity which of Plaintiffs' belongings will be destroyed immediately on Tuesday.   *Id.* If Plaintiffs' request is denied, they will lose some or all of their belongings in which they have a valuable property interest, and will lose the community and support network they have worked to build for over two months, including 24/7 onsite

medics, all food donations, regular COVID-19 testing, clothing donations, supplies donations,

medical donations, and a community with zero current COVID-19 cases. Plaintiffs will be cast

out of their supportive community and will be forced to into a much more hazardous situation of

once again living alone on the streets without any of their belongings, or be forced to seek the

support of shelters which have abused them, barred them from returning, which are not ADA

compliant, and which do not follow CDC COVID-19 guidelines and are unsanitary.  To dissolve

the camps would be to put Plaintiffs at substantial risk of loss of property and of contracting

COVID-19, and would deprive Plaintiffs of their First Amendment right to protest.

**B.**      **The Plaintiffs are Likely to Succeed on the Merits of their Claims**

Defendants' imminent actions meet the elements required of claims under the First

Amendment, the Fourth Amendment, Fourteenth Amendment due process clause, the Americans

with Disabilities Act, and their state-created danger claim. Defendants' actions will violate CDC

guidelines advising Americans to shelter in place, and will violate Defendant Mayor Jim

Kenney's own Orders relating to COVID-19.

      **i.**      **Plaintiffs are likely to succeed in their claim that the challenged actions vio-
l02late their First Amendment rights.**

The First Amendment, applied to state and local governments through the Fourteenth

Amendment, prohibits laws and regulations "abridging the freedom of speech." *U.S. Const.*

*amend. I.* Protected speech is not immune from regulation…. "the extent to which the

Government can control access depends on the nature of the relevant forum." quoting *Cornelius*,

473 U.S. at 800, 105 S.Ct. 3439 (1995). On one side of the spectrum is a public forum, property

that "has been traditionally open to the public for expressive activity, such as public streets and

parks." *Id.* In these spaces, "the rights of the state to limit expressive activity are sharply

circumscribed." *United States v. Marcavage*, 609 F.3d 264, 279 (3d Cir. 2010) (quoting *Perry*

*Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)). Time, place, and manner restrictions must be content neutral and narrowly tailored." Here, Plaintiffs have constantly maintained that these Encampments are protests, and that they are exercising their First Amendment right to protest in a public space. Time, place, and manner restrictions must be content neutral and narrowly tailored, and yet Defendants have given them no alternative locations at which Plaintiffs can exercise their First Amendment rights in this way. Defendants have not given Notices to vacate to any of the other protests which have occurred in Philadelphia in recent months, indicating that restrictions have not been content neutral as required by the First Amendment. They have only served notices on these 24/7 protests for permanent housing. As an aside, Defendants have demonstrated lack of competency in handling protests in the recent past, including but not limited to the April 1st 2020 trapping and use of chemical weapons on protestors on I-676. (whyy.org,  "Eyes blistering, crawling on highway: what it felt like to be tear gassed on 676", June 11, 2020.)  This lack of competency in allowing Philadelphians to exercise their First Amendment Rights have notably led Philadelphia Managing Director Brian Abernathy to resign amidst criticism of the City's handling of protests. (*The Philadelphia Inquirer*, "Philly Managing Director Brian Abernathy to resign following criticism of city response to protests", July 13, 2020.) These facts demonstrate Defendants' pattern and practice of violating First Amendment rights in Philadelphia.

      **ii.**      **<u>Plaintiffs are likely to succeed on their claim that the challenged actions vio-<br>late their Fourth Amendment rights.</u>**

The Fourth Amendment "protects the right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches." U.S. Const., Amend. 4. A "seizure" under the Fourth Amendment occurs "where there is some meaningful interference with an individual's possessory interest in that property." *Soldal v. Cook County Ill.*, 506 U.S.

56, 63 (1992). A seizure without a warrant is per se unreasonable, and the government bears the burden of showing that a warrantless search or seizure falls within an exception to the Fourth Amendment's warrant requirement. *California v. Acevedo,* 500 U.S. 565, 580 (1991). And even if a search or seizure is lawful at its inception, the seizure "can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'" *United States v. Jacobsen*, 466 U.S. 109, 124-25 (1984).

There should be no legal dispute that homeless individuals have a property interest in their tents, blankets, tarps, medication, personal papers and other items, and that these enjoy constitutional protection. While the Third Circuit has never considered the issue of homeless property interests, The Court of Appeals for the Ninth Circuit found that homeless individuals have a protectable property interest in their belongings. *Lavan v. City of Los Angeles,* 693 F.3d 1022, 1031 (9th Cir. 2012).

The destruction of homeless people's property is undoubtedly a deprivation that triggers Fourth Amendment analysis, *see Jacobsen*, 466 U.S. at 124- 25, and that deprivation—the wholesale destruction of most of plaintiffs' personal belongings—is patently unreasonable. *Lavan*, 693 F.3dd at 1030.

To the extent the City justifies its actions by invoking the Community Caretaking doctrine, such a justification cannot be sustained. The Community Caretaking Function "encompasses law enforcement's authority to remove vehicles that impede traffic or threaten public safety and convenience." *U.S. v. Smith,* 522 F.3d 305, 313 (3d Cir. 2008), citing *U.S. v. Coccia,* 446 F.3d 233, 238 (1st Cir. 2006).  Even assuming that the doctrine would extend to personal property, *see South Dakota v. Opperman*, 428 U.S. 364, 366 (1976) (holding that

unique characteristics of vehicles render the Fourth Amendment analysis different), using this exception to justify how the City mishandles homeless people's belongings would do violence to a doctrine that is designed to protect the property at issue and is legal only if it is "conducted pursuant to standard police procedures that are aimed at protecting the owner's property and at protecting the police from the owner charging them with having stolen, lost or damaged his property." *Cervantes,* 703 F.3d at 1141.

Nor can a concern for the general health and safety of the community justify the seizure and destruction of the property. In *Lavan* and its predecessors, the City argued that it needed to destroy property for public safety reasons. The District Court and the Ninth Circuit soundly rejected these arguments. See *Lavan*, 797 F. Supp. 2d at 1015 (noting that the seizure of property "threatens the already precarious existence of homeless individuals by posing health and safety hazards" and violated the Fourth Amendment, despite "an inherent interest in keeping public areas clean and prosperous"). The District Court's injunction in *Lavan*, which the Ninth Circuit upheld, allowed for the seizure of property based on an immediate threat to health and safety. *See Id.* at 1020. However, the Court also recognized that the seizure of the personal belongings of a homeless individual had significant health and safety implications for the individual whose property was seized, and prohibited the kind of wholesale destruction at issue in this case as well. *Id*.

### iii.   Plaintiffs are likely to succeed on their claims that the challenged actions violate their substantive due process rights under the Fourteenth Amendment.

The due process clause of the Fourteenth Amendment states, in pertinent part, "No State shall…deprive any person of life, liberty, or property, without due process of law; nor deny any person within its jurisdiction the equal protection of the laws. U.S. CONST Amend. XIV. The elements of a substantive due process claim are that: (i) defendants acted under color of law;

16

(ii) a protected property or liberty interest was at stake; (iii) the defendants had a duty of care to-toward the plaintiff; and (iv) a deprivation within the meaning of the due process clause occurred. *Roberts v. Mentzer*, 382 Fed.Appx. 158, 166 (3d Cir 2010); see *Fagan v. City of Vineland,* 22 F.3d 1296, 1310 (3d Cir 1994). Here, defendants are clearly acting under color of law as their Notices reference Titles in the Philadelphia Code and Mayoral Orders. Defendants are acting in their official capacity as the government of the City of Philadelphia. Plaintiffs have a protected property interest in preventing the detention and destruction of all their personal effects, and have a protected Constitutional right to protest. Defendants have a duty of care to plaintiffs as government officials to refrain from reckless conduct, or to avoid acting in deliberate indifference to their rights. If the temporary restraining order is not granted, Defendants will certainly deprive Plaintiffs of all the property they have in the world, a clear deprivation under the meaning of the due process clause.

Tents, tarps, blankets, medication, and other items are property protected by the Fourteenth Amendment. *See Lavan*, 693 F.3d at 1032 (holding that the protections guaranteed by the Fourteenth Amendment attach "regardless of whether the property in question is an Escalade or an EDAR, a Cadillac or a cart."). In most instances, the volume of what is taken and destroyed constitutes almost everything the individual owns in the world. The value to the plaintiffs is great, and this is sufficient to establish a property interest. The second question then is what process is due. Procedural safeguards come in many forms, including, inter alia, timely and adequate notice, pre-termination hearings, the opportunity to present written and oral arguments, and the ability to confront adverse witnesses - "due process is flexible and calls for such procedural protections as the particular situation demands." *Biliski v. Red Clay Consol. School Dist. Bd. of Educ.*, 574 F.3d 214, 220 (3d Cir. 2009), quoting *Mullane v. Central Hanover Bank*

& Trust Co., 339 U.S. 306, 313 (1950) ; see Goldberg v. Kelly, 397 U.S. 254, 267 (1970)). The amount of process that is due depends on a balance of factors outlined in *Mathews v. Eldridge*: "first, the private interest affected by the government action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Defendant's policy and practice of destroying property without any process, and storing property without sufficient notice or procedures to ensure its return, ignore these clearly established legal standards.

The wholesale destruction of property, without any method to challenge the destruction, violates the 14th Amendment. The summary destruction of property, whether it occurs on a moment's notice, incident to arrest, after detention of property if the individual is unable to retrieve it, or when the individual is unable to move it during a cleanup, suffers from the same Constitutional infirmity—it violates the owner's due process because it affords absolutely no process by which the owner of the property can challenge the destruction of their property before "the owner is finally deprived of a protected property interest." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982). This is anathema to the concept of due process. "However weighty the governmental interest may be in a given case, the amount of process required can never be reduced to zero - that is, the government is never relieved of its duty to provide some notice and some opportunity to be heard prior to final deprivation of a property interest." *Logan*, 455 U.S. at 434; *Parratt v. Taylor*, 451 U.S. 527, 540 (1981) ("our past cases mandate that some kind of hearing is required at some time before a State finally deprives a person of his property

18

interests")). Despite the "truism that some form of hearing is required before the owner is finally deprived of a protected property interest," *Logan*, 455 U.S. at 433, the City is yet again threatening to destroy Plaintiffs' property without any opportunity to challenge the basis for the destruction.

> iv.    **Plaintiffs are likely to prevail on their claim that the City's failure to provide adequate notice and a process to get a person's belongings back violates their right to due process under the Fourteenth Amendment.**

Due process requires an individual both "be given notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976.) This process "must be tailored to the capacities and circumstances of those who" must rely on the process. *Goldberg*, 397 U.S. at 268-69. For the notice to satisfy due process, "[t]he notice must be of such nature as reasonably to convey the required information." *Mullane v. Cent. Hanover Bank & Trust Co*., 339 U.S. 306, 314 (1950). The City also violates individuals' rights when it provides no meaningful notice or process to get back the few items it seizes and stores, let alone challenge the underlying seizure. Neither the First Notice nor the Second Notice provide any information about where Plaintiffs' personal property will be stored, nor any information about the procedure for accessing their stored property. Instead, the First Notice and Second Notice advise only that property will be stored for a maximum of 30 days before it will be permanently destroyed.

As laid out in *Mathews v. Eldridge*, first, "the nature of the interest . . . and the degree of potential deprivation that may be created," is significant. *Eldridge*, 424 U.S. at 341. Assuming, arguendo, that the City preserves some property, these few remaining items are frequently the last remaining belongings the person has. It is imperative that they get these items back quickly. As discussed below, remaining without them for even short periods of time may threaten their

health and safety. See *Lavan*, 693 F.3d at 1032. See also *Memphis Light, Gas and Water Divi-Division v. Craft*, 436 U.S. 1, 17-18 (1974) (holding that a deprivation for even a short period of time can threaten health and safety constitutes a significant interest).

The second *Eldridge* factor considers "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Eldridge*, 424 U.S. at 335. This factor requires the Court to weigh the "fairness and reliability of the existing procedures." *Nozzi v. Housing Authority of City of Los Angeles*, 806 F.3d 1178, 1193 (9th Cir. 2015). The City's procedures for getting property back after it taken is anything but fair and reliable. First, notice about how to get one's property back is insufficient. "To be constitutionally adequate, notice must be reasonably calculated under all circumstances, to apprise interested parties with due regard for the practicalities and particularities of the case." *Nozzi*, 806 F.3d at 1194 (citing *Mullane*, 339 U.S. at 314) (internal quotations removed). The notice provided here fails this test. [Examples] The failure to "take account for the 'capacities and circumstances'" of the individuals who must traverse this system renders an already unfair system unconstitutional. Nozzi, 806 F.3d at 1194 (quoting Goldberg, 397 U.S. at 268-69; Memphis Light, 436 U.S. at 14, n. 15).

Finally, the third Eldridge factor, which considers the burden on the government in providing due process, also weighs in favor of a due process violation. The burden of providing adequate process is minimal. It would not cost Defendants any significant money to describe with particularity and practicality the circumstances under which Plaintiffs' property is to be stored and the procedure for accessing their stored property, and to ensure that this procedure is reasonably calculated to apprise Plaintiffs of their ability to access their only property in the world in an expedient and unburdensome manner.

**v.**    **Plaintiffs are likely to succeed on their claim that the challenged actions are a state-created danger.**

State-created danger liability is borne out of a liberty interest in one's own bodily security. *Kneipp v Tedder*, 95 F.3d 1199, 1201 (3d Cir. 1996).  A successful state-created danger claim in the Third Circuit requires Plaintiffs to demonstrate the following elements: (1) "the harm ultimately caused was foreseeable and fairly direct," (2) a state actor acted with a degree of culpability that shocks the conscience, (3) a relationship between the state and the plaintiff existed such that "the plaintiff was a foreseeable victim of the defendant's acts," or a "member of a discrete class of persons subjected to the potential harm brought about by the state's actions," as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all. *Bright v. Westmoreland Cty.*, 443 F.3d 276, 281 (3d Cir. 2006) (quoting *Kneipp,* 95 F.3d at 1208; *County of Sacramento v. Lewis,* 523 U.S. 833, 834 (1998); *Miller v. City of Philadelphia,* 174 F.3d 368, 375–76 (1999); *Schieber v. City of Philadelphia*, 320 F.3d 409, 416 (2003)). Here, the harm of depriving Plaintiffs of their Constitutional rights and detaining and destroying their property is clearly a direct consequence of Defendants' plans to dissolve the Encampments and detain and destroy Plaintiff's property. As Defendants served Notices specifically upon Plaintiffs and their Encampments, Plaintiffs are members of a discrete class of persons subjected to potential harm by City officials; said class being individuals experiencing homelessness residing in the Encampments who received Notices to vacate from Defendants. Defendants are acting under color of law by citing Titles of the Philadelphia Code and by acting in their official capacity as the City government. And it is clear from the completely full occupancy of the Philadelphia shelters and the demonstrably dangerous and unsanitary conditions therein that Plaintiffs would be better off if Defendants did nothing

and allowed them to remain in their socially distanced, supported Encampments. When Defend-Defendants seize and destroy, or make inaccessible, the property of homeless individuals, they affirmatively place individuals in the following danger: 1) homeless individuals are left to sleep on the sidewalks without any protection from weather; and 2) when plaintiffs' medication and medically-necessary equipment is seized and destroyed or made inaccessible, they have no access to the life-sustaining treatment they need to survive.

    **vi.**    <u>**Plaintiffs are likely to succeed on their claim that the challenged actions are in violation of the Americans with Disabilities Act.**</u>

Title II of the Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To prove a claim under either the ADA, Plaintiffs must show that: "(1) they are handicapped or disabled as defined under the statutes; (2) they are otherwise qualified to participate in the program at issue; and (3) they were precluded from participating in a program or receiving a service or benefit because of their disability. *CG v. Pennsylvania Dept. of Education*, 734 F.3d 229, 235 (3d Cir. 2013). Here, many Plaintiffs are disabled both physically and/or mentally as defined under the American with Disabilities Act. Disabled Plaintiffs have been denied access to shelters or hotel rooms because they do not provide adequate disability accommodations. Many shelter doors cannot be opened by wheelchair-bound people, because they are too heavy. They physically cannot enter the shelters. Once inside, the shelters require residents to ascend and descend stairs, and at some locations residents are required to travel up multiple flights of stairs in order to receive shelter. (Declaration of Witness Ebonie Camp.) Many have been barred from shelters permanently because of behaviors directly tied to their mental disabilities. These Plaintiffs have been

precluded as a matter of fact from participating in the public shelter program, and are otherwise

qualified to participate.          Additionally, Defendants throw in Plaintiffs' faces the allegation of

drug abuse at the Encampments. While Plaintiffs do not wish to dispute that drugs may have

been used at the encampments, Plaintiffs respectfully remind the Court that addiction is a

disability as defined by the ADA, and that Defendants while touting the drug abuse at the

Encampments have offered no help in combating these addictions on-site.

> **v.**      **Defendants' desired actions are in violation of CDC Guidelines and Mayoral Orders.**

With regard to CDC Guidelines and Mayoral Orders, which have been cited by

Defendants as evidence of the necessity of destroying the encampments, Defendant Mayor James

Kenney released Emergency Orders on Business Activity and Congregation, in conjunction with

Dr. Farley, Health Commissioner of the City of Philadelphia. These guidelines state that  "All

Philadelphia residents shall remain home or at their place of residence unless they are engaged in

Essential Personal Activities, which include…..leaving the home for an educational, religious, or

political reason…. Individuals experiencing homelessness are exempt from this directive, but are

strongly urged to obtain shelter, and city agencies and other entities are strongly urged to make

such shelter available as soon as possible and to the maximum extent practicable (and to use in

their operation COVID-19 risk mitigation practices recommended by the USCDC, the PA Dept

of Health, and the Philadelphia Department of Public Health." (Office of the Mayor and

Department of Public Health, "Emergency Order Temporarily Prohibiting Operation of

Nonessential Businesses and Congregation of Persons to Prevent the Spread of 2019 Novel

Coronavirus (COVID-19)", March 22, 2020).  Here, in the absence of support from the City,

Plaintiffs have obtained shelter exactly as strongly urged by the Mayor's directive. They have

created their own shelter in the Encampments which is demonstrably safer and more stable for

the purposes of the shelter-in-place directive than the shelters provided by Defendants. Argu-

Arguments by the city relating to the sanitary conditions, drug use, feces in parking lots, lack of

access to water (although in reality, the Encampments have access to water through the

siphoning of a public water fountain to provide an outdoor shower, sink, and running water),

violence, and dirty bed linens would not be solved by relocation of Plaintiffs to the streets, or

relocation of Plaintiffs to the shelter system. As is made clear in Plaintiff Declarations, shelters

are communal residences where Plaintiffs would share rooms, and from the pattern and practice

among shelters of not following CDC guidelines, Plaintiffs likely would share rooms with

persons who have contracted COVID-19. (**Exhibit E**, Declaration of Witness Joseph Tucker.) .

Drugs are used in the shelters with impunity. Shelters have gone months without plumbing or

food. The practice of group-quarantining shelters by floor has been unsuccessful and actively

harmful in preventing the spread of COVID-19. *Id.* Neither shelters nor sleeping alone on the

streets will do anything to address any of the concerns outlined in Defendants' notices, and will

actively harm Plaintiffs.

  The solution provided by Defendants will not solve the problems proffered by

Defendants as reasons for the necessity of the Encampments' destruction. The problems

proffered by Defendants in their notices are mischaracterizations evidencing bias against the

Plaintiffs. How will Defendants' actions unilaterally cancelling Plaintiffs' contract with a

portable toilet provider, and order that portable toilets be removed or face substantial fines, solve

the problem of inadequate restrooms and reports of feces in parking lots and other public spaces?

How will the destruction of the Encampments prevent or avoid drug use, drug addiction, and

overdoses? How will the Encampments gain running water legally without using a public city

water fountain, if the City has not provided them with any running water themselves? How will

Plaintiffs wash their allegedly dirty bed linens if they are sleeping on the street alone? How will dissolving an Encampment where children reside with their families and putting these families on the street make children any safer? And finally, how will depriving Plaintiffs of their waterproof, close to the ground tents and forcing them to sleep unsheltered in the streets protect them from severe weather conditions? The answer is clear: the remedy provided by Defendants will not solve any of these issues. When asked to choose between the possibility of getting "struck by lightning" (see **Exhibit K**, Fourth Notice) and the near certainty of being exposed to COVID-19 and abused in the shelters, anyone of sound mind would choose the former. Plaintiffs do not dispute that two violent incidents have occurred within the encampments in over a month. But these numbers are relatively low given in comparison to rates of violence in Philadelphia as a whole and even in the surrounding area. The Philadelphia Police Department's Crime Mapper reports eleven crimes in the surrounding housed neighborhoods in the last seven days alone. Plaintiffs allowed PPD to conduct an investigation into these incidents just as they would have if the victim had been living on the street or in a shelter. Additionally, it is contradictory of Defendants to tout two nonfatal violent incidents in the Encampments when there were shootings of Philadelphians in public housing units, leading to one death, one injury, and bullets inside two homes and cars, during this same time period. (*Fox 29 News*, "two dead, three wounded in overnight gun violence in Philadelphia", July 15, 2020.) If Defendants cannot keep their own properties sheltered from violence, there should be no expectation of the Encampments, much less funded and equipped than Defendants to handle crime, to completely shelter their residents from violence.

   **vii.** **Other Circuit Courts have addressed this issue before, and ruled in favor of homeless Plaintiffs. This persuasive authority should guide this Court's decision.**

In 2019 the U.S. District Court for the Northern District of California granted a temporary restraining order for a homeless encampment that had been threatened with eviction and which brought claims under the Eighth and Fourteenth Amendments, finding that "Plaintiffs have demonstrated a likelihood of irreparable injury from the destruction of their personal property, that the balance of hardships tips sharply in their favor, and that the injunction is in the public interest." *Shipp v. Schaff*, 2019 WL 1472303 (U.S. Dist. Ct., N.D. Cal. 2019). In the Western District Court of Pennsylvania, the ACLU brought an action seeking to enjoin the City of Pittsburgh, The action resulted in a settlement with the City, which included more adequate procedures for the storage and retrieval of property detained during sweeps, and storage of all property "having some value" for one year. *Sager v. City of Pittsburgh*, CA-03-0635 (W.D. Pa. 2003).

**C.**     **The Plaintiffs and All Living in the Encampments Will Suffer Irreparable Harm if Injunctive Relief Is Not Granted**

Absent the Court's intervention, Plaintiffs will suffer irreparable harm from the City's policies and practices because they will violate their constitutional and property rights. No countervailing interest of the City outweighs the dire impact on Plaintiffs, who are homeless, live on the sidewalks pursuant to *Jones*, and suffer from multiple disabilities. The loss of essential possessions is "devastating" and clearly constitutes irreparable harm. *Lavan,* 693 F.3d at 1032, 1019.

The facts of this case clearly demonstrate that irreparable harm to Plaintiffs' property, health, and safety will be suffered if injunctive relief is not granted. Generally, "to show irreparable harm a plaintiff must demonstrate a potential harm which cannot be redressed by a legal or equitable remedy following a trial.'" *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994). In other words, the injury "'must be of a peculiar nature, so that compensation in

money cannot atone for it.'" *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92 (3d Cir. 1992) (quoting *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987)). Here, once the Encampments have been dispersed, Plaintiffs will be subjected to the detention and storage of some amount of their property in an undisclosed location with no information on how to retrieve it, and the rest of their property will be immediately destroyed on Tuesday, August 18, 2020. (See **Exhibits H, I, J, and K,** Notices.) Additionally, Plaintiffs will be cast out of their semi-permanent residences, denied their right to protest for permanent housing under the First Amendment, and will be forced to sleep on the streets alone, deprived of all their belongings at least temporarily and possibly forever. This property comprises all the belongings that Plaintiffs have in the world. They would be left with nothing. Plaintiffs would also be required to make a difficult and completely inhumane decision: to either 1) sleep alone on the streets, 2) apply for a state-sponsored hotel room (a temporary solution which no Plaintiffs have yet been able to utilize, and which would be worse than sheltering in place in their socially-distanced tents in the Encampments because they would have to move to a communal living situation and inevitably move out again in a month or less, without any path to permanent housing), or 3) seek the assistance of shelters which are already at full capacity, which have abused, mistreated, and stolen from Plaintiffs, and which some plaintiffs are permanently barred from utilizing because they spoke out about abuse and crime in the shelter system or because the shelters are not ADA compliant and therefore bar entry as a matter of fact to anyone with a physical disability. The shelters do not follow CDC social distancing and PPE guidelines, and some even do not have any soap, PPE, or toilet paper. Residents are housed communally in these shelters, and have been housed in the past with individuals with active COVID-19 symptoms. COVID-19 is running rampant throughout the shelter system, as evidenced by the fact that over 50% of residents and

volunteers at Philadelphia's largest men's shelter tested positive for COVID-19. (Kensington Voice, "at Philly's largest men's shelter, more than half of guests and staff test positive for COVID-19", published May 11, 2020.) Compared to the Encampments, which provide regular COVID testing and have a constant supply of PPE, have had only one COVID-19 case which was successfully quarantined, and are socially-distanced individually separated tent residences, the certainty of sleeping on the street alone and unsheltered or seeking help from a dangerous and unsanitary shelter puts Plaintiffs at significantly higher risk of contracting COVID-19. (See **Exhibit E**, email from Kimberly Chiaramonte of Philadelphia FIGHT Community Health Centers.) Without hyperbole, there is a substantial likelihood that Plaintiffs will contract or die of COVID-19 if their encampment is destroyed, and that all the property they have in the world will be destroyed or irretrievable.

**D.**     **The Balance of Equities Plainly Favor the Plaintiffs**

The balance of equities tips sharply to Plaintiffs. Defendants threaten to seize and destroy the only property that Plaintiffs own—property that constitutes Plaintiffs' only forms of shelter. injunctive relief will do nothing more than maintain the status quo between Defendants and Plaintiffs. When determining whether to issue a preliminary injunction, the court "must ensure that the issuance of an injunction would not harm the infringer more than the infringed-upon party." *Pappan Enter., Inc. v. Hardee's Food Sys.*, 143 F.3d 800, 805 (3d Cir. 1998)). The court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Buzz Bee Toys, Inc. v. Swimways Corp.*, 20 F. Supp. 3d 483, 510 (D.N.J. 2014). Here, Plaintiffs will suffer irreparable harm to their rights if an injunction is not granted, whereas the City will not suffer if it is ordered to follow the law. Moreover, Plaintiffs' interests in survival also outweighs Defendants' (speculative) public health

28

and safety concerns—especially since Defendants could easily take measures to control the very health and safety concerns they cite without destroying and seizing Plaintiffs' property.

Defendants' impending conduct will "be so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Kaucher v. County of Bucks*, 455 F.3d 418, 425 (3d Cir 2006). Depriving homeless residents of a supportive community and detaining and destroying their property, while providing no clear and accountable path to recover these belongings or a path to any sort of permanent housing, is enough to shock any reasonable conscience.

**E.**    <u>**An Injunction Will Serve the Public Interest**</u>

      This fourth element considers how an injunction will impact non-parties. This prong, too, is in Plaintiffs' favor since "It goes without saying… that a deprivation of a constitutional right is contrary to the public interest and the harm to others…although substantial, does not outweigh such a denial." *Reilly v. City of Harrisburg*, 336 F.Supp.3d 451, 472 (U.S. Dist. Ct. M.D. PA 2018), *See K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013), ("[T]he enforcement of an unconstitutional law vindicates no public interest").The public interest that will be served is the interest of all 5,700 homeless Philadelphians in their ability to shelter in place, take their own steps to protect themselves from COVID-19, to freely protest for permanent housing, to receive due process of law, to be free from harassment by Defendants, and to retain their valuable property interests. It has come to the Plaintiffs' attention that some members of the public are opposed to the Encampments because they are an eyesore, or because they have been asked for money by residents. But it must be absolutely clear that the interest of anonymous Philadelphians in being free from seeing homeless people in their community is a significantly weaker interest than the that of homeless Philadelphians to shelter in place, protect themselves and their property from dangerous conditions and invasion, and to protest for permanent housing. Moreover, the Encampments receive support from numerous organizations and residents of Philadelphia, who volunteer there every day and provide services to the Encampments' residents, including but not limited to the National Law Center for Homelessness and Poverty, Philadelphia's FIGHT Community Health Centers, the Student-Run Emergency Housing Unit of Philadelphia, Occupy PHA, the Worker's Revolutionary Collective, the Black Lives Matter movement, and approximately 150 regular volunteers that frequent the camp. As this very injunction is filed, hundreds of Philadelphians are organizing and planning to come support the

Encampments on Tuesday morning. If homeless Philadelphians' interests in health, safety, prop-property, and freedom of speech are not enough, the Encampments are supported and helped by hundreds of Philadelphians across the city.

Additionally, it is in the public interest not to act rashly, as there is no way to undo the damage that will be done if Defendants carry out their plans to dissolve the Encampments. The Third Circuit "recognizes that 'as a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor [the party seeking the injunction]." *See 2660 Woodley Rd.*, 1998 U.S. Dist. LEXIS 22825, at *23. Plaintiffs desperately need shelter which is not being adequately provided to them by the City. They have nowhere else to safely go, and therefore the public interest is served by allowing them to remain in the Encampments until Defendants give them a clear path to permanent housing for which Defendants can be held accountable.

## IV.    CONCLUSION

For the foregoing reasons, this court should grant the Plaintiffs Motion for a Temporary Restraining Order pending a full hearing on its motion for a preliminary Injunction, and enjoin Defendants from dissolving and destroying the Encampments unless and until Defendants 1) provide Plaintiffs with shelter which is safe, clean, individually separated and in compliance with CDC guidelines regarding the prevention of the spread of COVID-19, and 2) provide Plaintiffs including all residents at the Encampments with a clear path to permanent housing for which Defendants can be held accountable, and temporary housing until such time at which they are able to provide permanent housing, and 3) provide specific protocol and procedures for the location, labeling, and easy re-acquisition of Plaintiffs' property detained which will be held in

storage, in a manner which is accessible to all Plaintiffs, including those with transportation and

mobility issues.

BY:

Date:__8/17/2020_____

MICHAEL N. HUFF, ESQUIRE
Attorney I.D. No.:  72714
1333 Race Street
Philadelphia, PA 19107
(215) 567-2120
michael.huff.esq@gmail.com
ATTORNEY FOR PLAINTIFFS