**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IRVIN MURRAY, MAURICE SCOTT, DOLORES MCFADDEN, FAITH ANNE BURDICK, EDWIN JONES, and ALL OTHER HOMELESS RESIDENTS OF THE ENCAMPMENTS AT VON COLLN FIELD, JEFFERSON AND RIDGE, and the AZALEA GARDENS | : : : : : : : : | |
| Plaintiffs, | : | Case Number |
| v. | : | 2:20-cv-04018-ER |
| | : | |
| THE CITY OF PHILADELPHIA and MAYOR JIM KENNEY | : : : | |
| Defendants. | : : | |

**ORDER**

**AND NOW**, this _____ day of _____, 2020, upon consideration of Plaintiffs'

Motion for a Temporary Restraining Order, and the response in Opposition thereto of the City of

Philadelphia and Mayor Jim Kenney, it is hereby **ORDERED** that the Motion is **DENIED**.

_____
Robreno, J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IRVIN MURRAY, MAURICE SCOTT, DOLORES MCFADDEN, FAITH ANNE BURDICK, EDWIN JONES, and ALL OTHER HOMELESS RESIDENTS OF THE ENCAMPMENTS AT VON COLLN FIELD, JEFFERSON AND RIDGE, and the AZALEA GARDENS | : : : : : : : : | |
| Plaintiffs, | : | Case Number |
| v. | : | 2:20-cv-04018-ER |
| | : | |
| THE CITY OF PHILADELPHIA and MAYOR JIM KENNEY | : : : | |
| Defendants. | : : | |

### RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER BY DEFENDANTS THE CITY OF PHILADELPHIA AND MAYOR JIM KENNEY

Defendants, the City of Philadelphia and Mayor James Kenney, by and through the undersigned counsel, hereby submit this opposition to Plaintiffs' Motion for a Temporary Restraining Order.  The Court should deny Plaintiffs' motion for the reasons more fully explained in the accompanying memorandum,

WHEREFORE, Defendants respectfully request that this Court deny Plaintiffs' motion.

CITY OF PHILADELPHIA LAW DEPARTMENT
MARCEL S. PRATT, CITY SOLICITOR

By: **Diana P. Cortes, Esq.**
    Chair, Litigation Group
    PA Bar No. 204274
    (215) 683 -5038/diana.cortes@phila.gov
    **Kristin K. Bray, Esq.**
    Chief Deputy City Solicitor, Code & Public Nuisance Litigation
    PA Bar No. 200737
    (215) 683 – 5408 / kristin.bray@phila.gov
    City of Philadelphia Law Department
    1515 Arch Street, 15th Floor
Dated: August 19, 2020    Philadelphia, PA 19103-1595

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IRVIN MURRAY, MAURICE SCOTT, DOLORES MCFADDEN, FAITH ANNE BURDICK, EDWIN JONES, and ALL OTHER HOMELESS RESIDENTS OF THE ENCAMPMENTS AT VON COLLN FIELD, JEFFERSON AND RIDGE, and the AZALEA GARDENS | : : : : : : : : | |
| Plaintiffs, | : | Case Number |
| v. | : | 2:20-cv-04018-ER |
| | : | |
| THE CITY OF PHILADELPHIA and MAYOR JIM KENNEY | : : : | |
| Defendants. | : : | |

**MEMORANDUM OF LAW IN SUPPORT OF THE RESPONSE IN OPPOSITION OF DEFENDANTS THE CITY OF PHILADELPHIA AND MAYOR JIM KENNEY TO PLAINTIFFS' MOTION FOR THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER**

Defendants, the City of Philadelphia and Mayor James Kenney ("Defendants"), by and through the undersigned counsel, hereby submit this opposition to Plaintiffs' Motion for a Temporary Restraining Order ("Motion").

I.   <u>INTRODUCTION</u>

For over two months, the City of Philadelphia, in a valid exercise of its police powers, has repeatedly ordered individuals to stop unlawfully encamping on and remove their personal possessions from Von Colln Memorial Field, the Azalea Garden, and other City property along the Benjamin Franklin Parkway (collectively "City property"). This City property, which is a part of the Fairmount Park system, is maintained for the use and enjoyment by the entire public – a public which has been unable to use the City property as result of the unlawful encampment. As stated in the City's notices, the encampment poses a significant life-safety risk to the residents within the encampment and to the surrounding community.

Plaintiffs ask this Court to enter a temporary restraining order that would halt the City from removing the encampment from City property and a PHA property that the City does not own, operate, or control, unless the City meets two conditions.  First, Plaintiffs request the City provide them with a certain type of shelter and storage for their personal possessions.  Second, Plaintiffs ask this Court to enjoin the City unless and until the City makes certain policy commitments.[1]

As discussed in detail below, the Court should not enter a temporary restraining order against the City.  First, the City has already offered and continues to offer shelter and like accommodations to homeless Philadelphians and storage for homeless individuals' possessions, making any request for the same moot.   Second, even if the City had not made such an offer, Plaintiffs have failed to state a claim upon which relief can be granted and cannot meet their burden for a preliminary injunction.  Accordingly, this Court should reject Plaintiffs' request for a temporary restraining order.

## II.    FACTUAL BACKGROUND

### A.    City issues first notice directing the encampment occupants to leave and remove their personal property from Von Colln Memorial Field by no later than July 17, 2020.

In or around early July of 2020, the City of Philadelphia became aware of an encampment that had formed on Von Colln Memorial Field.  The encampment consisted of some individuals who were experiencing homelessness and some individuals who were, generally, protesting various government policies regarding housing for indigent and low-income individuals.[2]

---

[1] Plaintiffs also appear to request this Court institute a litigation hold.  Such a request is not an appropriate subject of a request for a temporary restraining order.

[2] To date, there are at least three separate organizations who have represented to the City that they are "protesting" on Von Colln Memorial Field, other City property, and PHA property.  These organizations, which do not necessarily have common goals, have identified themselves as: "Occupy PHA," "Black and Brown Workers Collective," and, "Workers Revolutionary Collective."  In addition to these organizations, homeless individuals, who may or may not be protesting, also may live in the tents that have been placed on Von Colln Memorial Field, and PHA property.  Throughout this brief, the City will collectively refer to all of the occupants of the encampment as the "encampment occupants" and, when relevant, distinguish between protestors and the homeless individuals.

As early as July 10, 2020, City officials immediately directed those individuals encamping on Von Colln Memorial Field that they should not erect tents and should leave the property immediately.  *See* Exhibit 3 (e-mail telling protest organization leaders that they cannot stay on the Parkway).  In addition, City officials began to attempt to offer services to homeless individuals in the encampment, individuals experiencing mental health or substance abuse problems, and individuals who otherwise needed social service support.  The City's efforts to offer these services were substantially undermined by persons in the encampment who barred City outreach workers from entering the encampment and providing assistance to the vulnerable population.

Despite the e-mail and notices, described below, to remove the tents and leave Von Colln Memorial Field, additional individuals were attracted to and invited into the encampment, including individuals believed to be from out of county and out of state.  This caused additional tents and other structures to be erected on Von Colln Memorial Field, rendering it largely unusable for the public.  At times the encampment even attempted to expand onto the City sidewalk and other portions of the public right-of-way.

Conditions deteriorated rapidly in the ever-growing encampment.  For example, it soon became clear that there was unlawful drug use taking place in the encampment.  Multiple calls were made for first responders to address individuals experiencing medical symptoms associated with drug use.  Unfortunately, those calls were placed too late for one encampment resident, who died of an overdose.

Similarly, the drug use and ever-increasing numbers of residents seemed to result in increased violence in and near the encampment.  There were at least two separate stabbing incidents: one in which the victim was a homeless individual and a second where the individual was so seriously injured that the individual was admitted to the hospital in critical condition.

Despite this serious crime and use of drugs, individuals within the encampment established

a self-styled "children's play area" within the encampment.  Inviting children into a situation involving drugs and violence presented a serious life-safety risk.

As a result of the ever-growing life-safety risk and ever-expanding encampment, on July 10, 2020, the City of Philadelphia posted a written notice on and around the City property and distributed handbills to occupants in the encampment (hereinafter, "July 10, 2020 notices").  A copy of the July 10, 2020 notices is attached to this reply as City Exhibit-1.  Plaintiffs admit they received those notices but did nothing to challenge them.

Those July 10, 2020 notices informed occupants of the encampment that their intention to the use the City property as a long-term outdoor living facility was unlawful for numerous reasons inclusive of identifying the various code provisions, regulations, and orders that the behavior in the encampment violated.  *See* City Exhibit-1.  For example, it is a violation of the City's building and zoning codes to erect structures, without meeting any building, fire, or other safety codes, on a parcel that is zoned for parks and open spaces.  The failure to meet minimum code standards is especially when those structures are being used to host a vulnerable population.

The July 10, 2020 notices also informed occupants that the conditions at the encampment were unsanitary.  For example, the only running water in the encampment came from siphoning water from a City water fountain.  Such limited water supply does not allow for routine handwashing, an especially important health protocol during the current COVID-19 health crisis.  The limited water supply also did not allow for individuals to routinely wash clothes and bedding, which could lead to the spread of disease.  Moreover, encampment occupants were eating food that was not properly refrigerated and from unknown sources, which could lead to an untraceable food-borne illness outbreak.

In addition to the health risk to the encampment residents, the July 10, 2020 notices informed the encampment occupants that remaining in the encampment posed a serious risk to the

surrounding community.  Because there were no permanent restroom facilities, encampment occupants were defecating and urinating throughout the surrounding community.  In fact, since the encampment was formed, the City has received, in a span of 60 days, complaints from over 200 neighbors about nuisance-like behaviors believed to be caused by encampment occupants and/or individuals drawn to the encampment.  Finally, because the tents were close together and there was not routine mask wearing in the encampment, there was a substantial risk of the spread of COVID-19 to the community.

In addition to these life-safety risks, the July 10, 2020 notices informed the encampment that the behavior was damaging the park, which the City held for the use and enjoyment of the public.  Encampment occupants had placed trash throughout the property, placed banners, and installed structures on City park land that was not meant for camping.

As a result, the City ordered the encampment occupants to remove their personal property by no later than July 17, 2020 at 9:00 a.m.  The July 10, 2020 notices also informed encampment occupants that if they could not take their personal possessions, the City would store those personal possessions for thirty days.  The City did inform encampment occupants it would not store trash or other debris and, through the notice, provided plain-language examples of the differences between trash and personal possession.

In addition, the City's July 10, 2020 notices informed encampment occupants that, if they wanted assistance with seeking shelter, medical treatment, or other social services, they could call various City offices.  For those occupants who did not have a telephone, the notice provided two addresses where individuals could walk to and seek assistance.

Moreover, throughout this period, the City attempted to send homeless outreach workers into the encampment to connect homeless individuals with services that they needed and to encourage homeless individuals to enter shelter and come in off of the streets.  These efforts by the

City outreach workers were rebuffed by the protestors in the encampment.  The protestors in the encampment repeatedly did not permit City outreach workers to enter the encampment to talk to homeless individuals.  In one particularly unfortunate incident, protestors in the encampment attempted to assault a City outreach worker who was trying to provide homeless encampment occupants with services.

### B.     The City provides additional notice to leave Von Colln Memorial Field and other City property on which the encampment expanded.

Despite receiving notice that encamping on City land without permission was unlawful, the encampment expanded further on Von Colln Memorial Field, onto additional Fairmount Park property – such as the Azalea Garden, and onto property owned by the Philadelphia Housing Authority.  That property owned by the Philadelphia Housing Authority is slated for a multi-million-dollar development that is at risk of not starting because of the expanding and persistent encampment.

At the same time a loosely connected group of individuals who identified themselves as "organizers" of the encampment implied that they would leave the various encampments voluntarily if the City would meet with the protestors to discuss their concerns about City policy. As such, the City determined that it would postpone the scheduled encampment resolution and engage in negotiations with the encampment "organizers."

The City negotiated in good faith with the encampment "organizers." Negotiations were severely hampered by differences of opinion amongst the protestor groups, who appeared to have divergent demands.  Likewise, the protestors insisted that the City make promises that were outside of the City's control for a variety of reasons *e.g.,* federal guidelines did not allow for the City to meet such requests.[3]  At one point, the protestors ceased good faith negotiations.  They declared

---

[3] *See*, *e.g.*, *Flowchart of HUD's Definition of Chronic Homelessness,* U.S. DEPT. OF HOUSING AND URBAN DEVELOPMENT (Nov. 2016), https://files.hudexchange.info/resources/documents/Flowchart-of-HUDs-Definition-of-

that all negotiations would cease if the City did not concede to every single demand that the protestors had.  Finally, it became clear that the protestors did not necessarily represent the views of all of the individuals within the encampment; in some cases the various protestors often disagreed amongst themselves on the demands from the City.

Soon after, the protestors in the encampment publicly announced they would no longer engage in negotiations with the City.  Consequently, on August 17, 2020, the City sent an additional round of notices to the encampment occupants.  *See* City Exhibit 2, which is a true and correct copy of the August 17, 2020 notices.  Like the earlier July 10, 2020 notices, the City once again noted that the encampment was unlawful and that all occupants must leave the encampment and remove their personal possessions by no later than August 18, 2020 at 9:00 a.m.  The Plaintiffs admit that they received the August 17, 2020 notices.

In addition, the August 17, 2020 notices identified that many of the conditions noted in July 10, 2020 notices had remained the same or, worse, had become exacerbated.  For example, the drug use in the encampment had escalated, especially the use of K-2, a particularly troubling drug that can cause users to exhibit violent behavior and may explain the increasing amounts of human waste throughout the neighborhood.  In fact, in a one-month period, there had been twenty-one calls for emergency medical services for individuals experiencing symptoms associated with overdose.

Conditions in the encampment remained incredibly unsanitary.  In fact, at least one encampment occupant had norovirus, a highly contagious virus that can cause severe gastrointestinal symptoms.  With no running water, aside from the unlawful siphoning of water

---

Chronic-Homelessness.pdf; *Determining Homeless Status of Youth*, U.S. DEPT. OF HOUSING AND URBAN DEVELOPMENT (Oct. 2015), https://files.hudexchange.info/resources/documents/Determining-Homeless-Status-of-Youth.pdf; *Homeless Definition*, U.S. DEPT. OF HOUSING AND URBAN DEVELOPMENT (Jan. 2012), https://files.hudexchange.info/resources/documents/HomelessDefinition_RecordkeepingRequirementsandCriteria.pdf; *Guidance for Chronic Homeless Documentation Project*, U.S. DEPT. OF HOUSING AND URBAN DEVELOPMENT (Sept. 2007), https://files.hudexchange.info/resources/documents/DefiningChronicHomeless.pdf.

from a water fountain, concerns remained high that additional communicable diseases could rapidly spread throughout the encampment.  Particularly troubling was that the encampment occupants appeared to continuously fail to wear masks or socially distance, which could lead to the community spread of COVID-19.

Further, the encampment occupants had unlawfully connected to City electric sources and placed grills and other cooking devices throughout the encampment.  The unlawful electrical hook-up is dangerous; it could have caused an encampment occupant to be electrocuted or caused a fire amongst the densely packed tents.  Likewise, the proliferation of grills and cooking devices also compounded the risk of a fire in the camp.

Another new risk also presented itself in the form of Tropical Storm Isaias, which caused flooding in and around the encampment.  By all accounts, scientists are calling for an extremely active 2020 Atlantic hurricane system.  These storms could cause flying debris, topple trees, cause flash flooding, and could feature lightening --- all of which puts individuals living in an open field at severe risk of injury and even death.

Like the earlier City notices, the August 17, 2020 notices directed individuals in the encampment that they should leave the encampment and could and should take their personal possessions with them.  If individuals were unable to take their possessions with them, the City was prepared to store those possessions for thirty days.  Once again, individuals were also directed as to where they could obtain shelter and other social services by either calling or going to City offices.

### C.    The City remains open to providing shelter and storage of personal possessions for any homeless individual who wishes to avail themselves of the City services.

To date, despite being outright barred from entry into the encampment by the protestors, City outreach workers have been able to encourage over ninety individuals to accept temporary housing, residential treatment programs or housing in one of the City's COVID Prevention Spaces.

10

To the extent that any individual wants services or entry into a shelter, recovery housing or residential treatment, the City is willing – to this very day – to assist residents with obtaining these accommodations and obtain benefits that may be available to them.

Along those lines, the City is willing to assist encampment occupants, and any other homeless individual obtain a variety of services, including but not limited to:

1. substance abuse treatment;

2. mental health treatment;

3. behavioral health treatment;

4. assistance with obtaining veteran's benefits;

5. shelter placement (separate for single men, single women, and families);

6. "COVID-prevent site" placement shelter which is shelter placement for individuals who are over 65 years of age or have an underlying health condition that places that individual in a high-risk group should they contract COVID-19;

7. assistance with obtaining Medicaid benefits;

8. assistance with obtaining Social Security benefits; and,

9. assistance with re-connecting with family.

Of course, the City would individually assess each individual to appropriately connect them with the benefits that they need.

To the extent that individuals have not received these services to date, it is likely either a result of those individuals not seeking the services for a variety of personal reasons.  In addition, certain protestors in the encampment have consistently barred outreach workers from speaking to the homeless encampment occupants, which has certainly not helped with homeless individuals receiving services.

As of the filing of this brief, the City reasonably believes it has a shelter bed, or other

accommodation, as described above, available for *every* homeless individual in the encampment. Entering a shelter is the first step in any individual's path to more permanent housing.  Federal regulations and grant guidelines, which are the primary source for the City's funding for homeless programs, require that individuals enter through the homeless services system, be assessed, and then, gradually be connected with appropriate services and housing.[4]  The City cannot change nor can it violate these federal requirements.

Further, the City recognizes that many of the homeless individuals in the encampment have personal possessions with them.  When the encampment is removed from the City property, the City would encourage those individuals to keep and take their personal possessions with them.

For those individuals who are unable to take their possessions with them, the City will offer storage of those possessions for thirty days.  Personal items will be stored in containers that will be appropriately labeled so individuals can easily retrieve their possessions.  Individuals will be given a receipt; however, the City will also keep records so that if an individual loses a receipt, the City will have a potential alternative means of reconnecting an individual with their possessions.

To the extent that any items are left on City property, after the encampment is removed, the City would be well within its police powers to dispose of those items as there would be no reasonable belief to consider them anything other than debris – as those items would remain unclaimed.

Thus, in conclusion, the City is willing to work with any homeless individual, inclusive of those in the encampment, who wants to avail themselves of the City's shelter and storage services.

---

[4] *See, e.g.*, *Flowchart of HUD's Definition of Chronic Homelessness,* U.S. DEPT. OF HOUSING AND URBAN DEVELOPMENT (Nov. 2016), https://files.hudexchange.info/resources/documents/Flowchart-of-HUDs-Definition-of-Chronic-Homelessness.pdf; *Determining Homeless Status of Youth*, U.S. DEPT. OF HOUSING AND URBAN DEVELOPMENT (Oct. 2015), https://files.hudexchange.info/resources/documents/Determining-Homeless-Status-of-Youth.pdf; *Homeless Definition*, U.S. DEPT. OF HOUSING AND URBAN DEVELOPMENT (Jan. 2012), https://files.hudexchange.info/resources/documents/HomelessDefinition_RecordkeepingRequirementsandCriteria.pdf; *Guidance for Chronic Homeless Documentation Project*, U.S. DEPT. OF HOUSING AND URBAN DEVELOPMENT (Sept. 2007), https://files.hudexchange.info/resources/documents/DefiningChronicHomeless.pdf.

## III.    STANDARD OF REVIEW

Preliminary injunctive relief, in the form of a temporary restraining order or a preliminary injunction is an "extraordinary remedy" and "should be granted only in limited circumstances." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). The standard for granting a temporary restraining order is the same as the standard for granting a preliminary injunction. *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988).

A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the non-moving party; and (4) that the public interest favors such relief. *Conestoga Wood Specialties Corp. v. Sec'y of the U.S. Health and Serv.*, 724 F.3d 377, 382 (3d Cir. 2013). While all four factors must favor preliminary relief, "[t]he first two factors are prerequisites for a movant to prevail." *Holland v. Rosen*, 895 F.3d 272, 286 (3d Cir. 2018); *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017).

In considering an application for a preliminary injunction, the Court considers the abbreviated set of facts placed before it by the parties. *Frank's GMC Truck Center*, 847 F.2d at 101-02. "[T]he burden of introducing evidence to support a preliminary injunction is on the moving party with respect to the first two issues; however, the same is not true of the second two issues." *Neo Gen Screening, Inc. v. TeleChem Int'l, Inc.*, 69 F. App'x 550, 554 (3d Cir. 2003) (unpublished) (*citing Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994)). "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (original emphasis)).

## IV.    ARGUMENT

Plaintiffs cannot show that they merit the extraordinary remedy of a preliminary injunction.

13

Plaintiffs cannot establish a likelihood of success on the merits of their claims.   Additionally, Plaintiffs' contentions regarding the threat of imminent and irreparable harm are speculative. Finally, the balancing of the equities favors denial of Plaintiffs' Motion.

    **A.**    **Plaintiffs Have Not Shown, and Cannot Show, a Likelihood of Success on the Merits of their Claims**

        **1.**    **Plaintiffs Cannot Establish a Violation of Their First Amendment Rights.**

The First Amendment does not "guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981); *see also, e.g.*, *Startzell v. City of Philadelphia*, 533 F.3d 183, 202 (3d Cir. 2008) (holding arrest of disorderly protestors at OutFest did not violate the First Amendment); *Menotti v. City of Seattle*, 409 F.3d 1113, 1138 (9th Cir. 2004) (upholding order barring protestors from entering downtown Seattle during trade meetings); *White House Vigil for ERA Committee v. Clark*, 746 F.2d 1518, 1538 n.120 (D.C. Cir. 1984) (holding regulation of size, construction, and placement of signs on White House sidewalk were reasonable time, place, and manner restrictions).   Even in a traditional public forum, the City may impose restrictions upon speech, so long as these measures are:  1) content-neutral; 2) narrowly tailored to serve a significant government interest; and 3) leave open ample alternative channels of communication. *Startzell*, 533 F.3d at 196 (*citing Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

In order to determine whether a restriction on First Amendment activities is content neutrality, the principle inquiry is whether the government has adopted a regulation due to a disagreement with the protected activity and the government's purpose "is the controlling consideration" in this inquiry. *Ward*, 491 U.S. at 791.  For example, in *Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984), the United States Supreme Court held that a

prohibition on camping was a content-neutral time, place, and manner regulation after concluding

that the regulation served a legitimate government purpose.  *Clark* concerned a group of

demonstrators that sought to mount a vigil against homelessness who challenged Park Service

regulations forbidding camping in certain parks, and claimed that the restrictions on camping

violated their First Amendment rights.  *Id*. at 292.  In rejecting the protestors' claims, the Court

opined that the government had a legitimate interest in ensuring that the parks were adequately

protected, especially where the government believed the parks would be exposed to more harm

without the sleeping prohibitions than with them.  *See* 468 U.S. at 297.  The Court further

explained why such considerations were content-neutral:

> [T]here is a substantial Government interest in conserving park property, an interest
> that is plainly served by, and requires for its implementation, measures such as the
> proscription of sleeping that are designed to limit the wear and tear on park
> properties.  That interest is unrelated to suppression of expression.

468 U.S. at 299; *see also We've Carried the Rich for 200 Years, Let's Get Them Off Our Backs –*

*July 4th Coalition v. The City of Philadelphia*, 414 F. Supp. 611, 615 (E.D. Pa. 1976) (City's denial

of plaintiffs' request to erect a 2,000 person tent-city on public property did not violate plaintiffs'

First Amendment rights, due to the "obvious considerations of health and safety" such a tent city

would create).

Here, the City's purpose in removing the encampment is multifold and rooted in the City's

duty to exercise the police powers to ensure the health, safety, and welfare of all its residents and

visitors, including the organizers and occupants of the encampment.  In the judgment of the City's

public health officials, the lack of running water and waste disposal, exposure to the elements, and

close confines creates unsanitary conditions and a risk for the spread of communicable disease,

including COVID-19.  In addition to the risk of disease associated with the encampment, the illegal

hookup of electricity and exposure to the elements, especially as we enter a season with more

15

challenging weather, presents a real risk to the physical makeup of the encampment. The encampment has led to an increase in drug use and criminal activity on the City property, and the encampment itself is operating in violation of the Philadelphia Code. *See Exhibits 1-2.*  The impact on the park land has been significant and the encampment has worked to exclude use of the land by other residents and visitors within the City.  None of these purposes has to do with the content of the Plaintiffs' First Amendment activity and communication; each one of these purposes is sufficient to establish that the City's actions to clear the encampment are legitimate.

In order to determine whether a restriction on First Amendment activities is narrowly tailored, the principle inquiry is whether the challenged regulation promotes a substantial government interest that, absent the regulation, would be achieved less effectively; the inquiry is not whether the means employed is the least restrictive available.  *Ward*, 491 U.S. at 799 & n.6; s*ee also Clark*, 468 U.S. at 296.  The requirement that a regulation be narrowly tailored recognizes that the validity of the regulation does not turn on "agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted."  *Ward*, 491 U.S. at 800 (internal quotations omitted).  In *Startzell*, the Third Circuit Court of Appeals examined the City's conduct regulating the speech of a group of protestors that wished to express their disagreement with celebrations of LGBTQ identity and pride in the midst of OutFest, one of the largest such celebrations in the United States.  533 F.3d 189.  In bringing their challenge to the City's regulation of their First Amendment activity, the appellant-protestors did not challenge the City's interest in ensuring the safety of persons using the public streets, but argued that their complete removal from the event area, which was held in a public forum, was an insufficiently narrow restriction of their First Amendment activities.  *Id*. at 201.  However, the Third Circuit Court of Appeals concluded that the action taken by the police to completely remove the appellant-protestors from the public streets

where the event was held was narrowly tailored because the protestors had been allowed to move about freely until they began to act disorderly, infringe on the rights of others, and disobey police orders.  533 F.3d at 202.

Plaintiffs argue that the City has given them no "alternative locations at which Plaintiffs can exercise their First Amendment rights *in this way*."  Plaintiffs' Memorandum of Law at 14. (emphasis added).  However, the test of whether the City's action is narrowly tailored is not whether the City's action allows the Plaintiffs to exercise their First Amendment rights exactly as they please.  Much like the appellant-protestors in *Startzell*, Plaintiffs are free to protest, organize, and advocate for their believes within the City, they just may not do so in a way that infringes on the rights of others and obstructs the public peace.

The final inquiry necessary to determine whether the City's actions are valid time, place, or manner restrictions is whether there are alternative avenues available for the protected activity.  *See Startzell*, 533 F.3d at 202 (where plaintiffs were offered alternative ways to express themselves without causing disruption to already-existing uses, those options were sufficient alternative channels for expression).  "[T]he Supreme Court has required that an alternative means of communication provide only a 'reasonable opportunity' for communication of the speaker's message."  *Galena v. Leone*, 638 F.3d 186, 203 (3d Cir.2011) (*citing City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 56 (1986)).  Accordingly, a speaker is not entitled to his or her favored or most cost-effective mode of communication.  *See, e.g., Mastrovincenzo v. City of N.Y.*, 435 F.3d 78, 101 (2d Cir.2006) ("The requirement that 'ample alternative channels' exist does not imply that alternative channels must be perfect substitutes for those channels denied to plaintiffs by the regulation at hand...").  Rather, people engaged in First Amendment activities must simply be afforded the opportunity to "reach the intended audience."  *Johnson v. City & Cty. of Philadelphia*, 665 F.3d 486, 494 (3d Cir. 2011).

17

The Notices issued by the City order Plaintiffs to cease encamping on the City Property. The Plaintiffs are not prevented from advocating, communicating, and otherwise exercising their First Amendment rights consistent with the law; they simply may not do so by erecting tents and other structures to establish an encampment for 24/7 occupation of the City Property.  Plaintiffs' desire to exercise their rights through one narrow channel does not render the myriad other channels available to them insufficient or unavailable.

> **2.     Plaintiffs Cannot Establish a Violation of Their Fourth Amendment Rights.**

The City of Philadelphia's proposed action to remove individuals' abandoned property in the Parkway encampments is reasonable and does not violate the Fourth Amendment.  The Fourth Amendment, applicable to the states through the Fourteenth Amendment, requires that seizures of property be conducted reasonably and "what is reasonable depends on the context."  *New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985).  "The reasonableness determination requires the court to balance both private and government interests."  *Soldal v. Cook Cty.*, 506 U.S. 56, 71 (1992).  Here, the City's legitimate interest in removing an immediate unsafe and hazardous condition that is detrimental to the public health must be balanced against the property interest of those individuals encamped on public property.[5]  This balancing analysis is informed by the City's reasonable actions to date, which include providing ample notice of the removal along with resources and outreach to the Plaintiffs.

Applying the Fourth Amendment reasonableness test to the potential seizure of property

---

[5] Contrary to Plaintiff's contention, the City's lack of warrant in this instance does not make its potential seizure *per se* unreasonable.  The warrant safeguard is unnecessary when evidence of municipal code violations is obvious and unchallenged.  *Gariffo Real Estate Holdings Co. v. City of Philadelphia*, 2007 WL 1410607, at *5 (E.D. Pa. May 11, 2007) (finding warrantless seizure of a dangerous building was not *per se* unreasonable where municipal code violations – a collapsed wall – were evident and clearly in public view).  As in *Gariffo*, myriad violations of the Philadelphia Code outlined in the City's notices of violation are obvious and clearly viewed from, and in fact exist upon, public property.  Further, Plaintiffs have not challenged any of the underlying violations of the Philadelphia Code in its instant filings or in any other venue.

belonging to homeless and unsheltered people is an issue of first impression in the Third Circuit. However, the City of Philadelphia's past and planned actions regarding the clearing of the Plaintiffs' encampments are reasonable and thus satisfy the requirements of the Fourth Amendment as prescribed in analogous contexts.  When property is "seized because of the danger it poses and adequate recourse is provided to challenge any action taken by the local government, the seizure does not violate the Fourth Amendment." *Gardner v. McGroarty*, 68 F. Appx. 307, 312 (3rd Cir. 2003) (unpublished).  The residential property in *Gardner* was designated unfit for human habitation under the local housing code due to the property's lack of heat.  *Id.*  This unfit-for-human-habitation designation constituted an "emergency" as a matter of law justifying the local government's seizure of the building as reasonable under the Fourth Amendment.  *Id.*  The property owner was provided notice of the violation of the local government housing code and did not utilize the available administrative remedies to challenge the city's action.  *Id.* at 309.  The unsafe and unsanitary conditions at Plaintiffs' encampments – including a lack of running water, improper waste disposal, documented unlawful drug use, violence, exposure to the elements, and lack of prescribed precautions to mitigate the spread of COVID-19 – clearly pose a far greater public health and safety emergency than the conditions in *Gardner*.  Like *Gardner*, Plaintiffs also received sufficient notice of the unlawful nature of the encampment and adequate recourse exists to challenge the City's potential action.  The abundant notice provided by the City to the Plaintiffs and the exigent dangers at the encampments demonstrate the reasonableness of the City's potential seizure at the encampments and indicate Plaintiffs have a low likelihood of success on the merits of their Fourth Amendment claim.

While potential seizure of property belonging to homeless and unsheltered people is a novel issue in this Court, this issue is frequently litigated in the Ninth Circuit's Court of Appeals and its District Courts.  Plaintiffs' arguments rely heavily on the decision of the Ninth Circuit Court of

Appeals in *Lavan v. City of Los Angeles*, 693 F.3d 1022 (9th Cir. 2012).  In *Lavan,* the court

considered whether the City of Los Angeles could, without any notice, remove and destroy the

personal property of homeless residents of the city.  *Id.* at 1024.  During that litigation, the City of

Los Angeles admitted "that it failed to provide any notice or opportunity to be heard" prior to

seizing and destroying property belonging to homeless and unsheltered people.  *Id.* at 1032.  While

*Lavan* held that collecting and destroying the property of homeless and unsheltered people without

notice constituted an unreasonable seizure under the Fourth Amendment, it also acknowledged that

some seizures of property still may be necessary to protect against "an immediate threat to public

health or safety."  *Id* at 1026.  The City of Los Angeles' failure to provide notice and subsequent

storage of property in *Lavan* stands in stark contrast to the actions taken here by the City of

Philadelphia, which include multiple notices, both oral and written, a process for storing personal

property belonging to the Plaintiffs, and additional offers of assistance made by the City of

Philadelphia to Plaintiffs in the months leading up to the City's proposed clearing of the

encampment to mitigate the threat to public health and safety.

   In the eight years since the *Lavan* decision, Ninth Circuit municipalities have acted within

the parameters of *Lavan* and the Fourth Amendment to protect public health by clearing homeless

encampments.  In applying *Lavan,* the District Court of the Western District of Washington agreed

with the City of Seattle's contention that "a city may clean up [homeless] encampments consistent

with the Fourth and Fourteenth Amendments so long as the city provides notice beforehand and a

reasonable opportunity for retrieval of the property that is removed."  *Hooper v. City of Seattle*,

2017 WL 591112, at *6 (W.D. Wash. Feb. 14, 2017) (unreported) (denying temporary restraining

order because Plaintiffs unable to show a likelihood success on the merits of their Fourth

Amendment claim).  In *Hooper,* the Washington State Department of Transportation posted notices

of the pending clean-ups of encampments at least 72 hours in advance and outlined procedures for

inventorying any personal property found at the encampments.  *Id.* at 5.  Likewise, the District

Court of the Northern District of California found the City of Berkley's removal of property from a

homeless encampment reasonable under the Fourth Amendment when encamped individuals

ignored notice that they were required to move their property, or the City would take action to do

so.  *Sullivan v. City of Berkeley*, 383 F. Supp. 3d 976, 986 (N.D. Cal. 2019).  *Sullivan* held that the

City of Berkley's "removal of unattended items for placement into storage (or its disposal of items

reasonably believed to be abandoned or trash) in these instances does not violate the Fourth or the

Fourteenth Amendments."  *Id.* at 987.  To hold otherwise would render a municipality unable "to

enforce its laws or clear entrenched encampments that block public spaces without running afoul of

the Constitution."  *Id.*  Additional municipal policies of providing notice and storage of items have

been found reasonable under the Fourth Amendment and *Lavan*.[6]  Like Seattle and Berkley and

other Constitutionally conscientious municipalities throughout the nation, the City of Philadelphia

has gone to great lengths to provide adequate notice to Plaintiffs of the pending encampment

cleanout and to provide storage of any non-hazardous personal property found at the sites during

the cleanout.[7]  The actions of the City of Philadelphia to provide notice and outreach, and the

proposed storage of personal property from the encampments, like Seattle and Berkley, satisfy the

---

[6] *See e.g. Proctor v. D.C.*, 310 F. Supp. 3d 107, 114 (D.D.C. 2018) (finding encampment plaintiffs unlikely to prevail on the merits of its Fourth Amendment claim where District of Columbia's destruction of personal property followed a two week notice period with outreach workers visiting the encampment); *Martin v. City & Cty. of Honolulu*, 2015 WL 5826822, at *4 (D. Haw. Oct. 1, 2015) (unreported) (finding City of Honolulu was reasonable under the Fourth Amendment by providing twenty-four hours written notice before items are seized and providing subsequent storage of seized items).

[7] Plaintiff cites *Sager v. City of Pittsburgh,* CA-03-0635 (W.D. Pa. 2003).  As noted in Plaintiffs' complaint this matter was settled.  Plaintiffs describe this settlement as "includ[ing] more adequate procedures for the storage and retrieval of property detained during sweeps, and storage of all property 'having some value' for one year." (Plaintiffs' Memorandum of Law at 26.) The settlement is described in more detail at https://www.nationalhomeless.org/publications/crimreport/casesummaries_1a.html (last visited July 19, 2020) and very closely resembles the process and procedure used by the City of Philadelphia in that notice is given prior to any removal by posting at the encampment site, all items that are not hazardous are placed in storage containers or bags and tagged, notice is given as to where items will be stored, for how long, and what is required to retrieve the items, including days and times when items may be retrieved.

reasonableness requirements of the Fourth Amendment and portend failure of Plaintiffs' Fourth

Amendment claim on the merits.

### 3. Plaintiffs Cannot Establish a Violation of Their Substantive Due Process Rights Under the Fourteenth Amendment.

Plaintiffs fail to establish a protected property interest to which the Fourteenth

Amendment's substantive due process protections applies.  The Due Process Clause of the 14th

Amendment provides that no state shall "deprive any person of life, liberty, or property, without

due process of law."  U.S. Const. Amend. XIV § 1.  Substantive due process encompasses two

distinct conceptual threads: legislative state action and non-legislative state action.  *See, e.g.*

*Nicholas v. Pennsylvania State University*, 227 F.3d 133, 139 (3d Cir. 2000).  The governmental

action at issue here—executive action to remove persons from City Property—is non-legislative

state action.  *Id*. at 139 & n.1.  To prevail on a non-legislative substantive due process claim, a

plaintiff must establish a protected property interest under the Fourteenth Amendment.  *Id.* at 139-

40.  This property interest "must be constitutionally fundamental in order to implicate substantive

due process."  *Id.* at 141 (internal quotation marks omitted).  Government action concerning non-

fundamental property interests need only satisfy the requirements of procedural due process under

the Fourteenth Amendment.  *Nicholas*, 227 F.3d at 142  (internal quotation marks omitted).

The Third Circuit Court of Appeals "directs district courts to narrowly define protected

rights for purposes of substantive due process."  *Saucon Valley Manor, Inc. v. Miller*, 392 F. Supp.

3d 554, 571 (E.D. Pa. 2019).  For non-legislative substantive due process claims in this Circuit, the

"only protected property interests deemed fundamental involved ownership of real property."

*Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 155 (3d Cir. 2018) (declining to find a

fundamental property interest in taxi medallions); *see also Saucon Valley Manor, Inc.*, 392 F. Supp.

3d at  570 (declining to find a fundamental property interest in Commonwealth personal care home

license).  Plaintiffs do not have, nor do they claim, property interest in the public property upon

which they unlawfully encamp.  Instead, Plaintiffs ask for an expansion of the Third Circuit's

fundamental property interest to include their nonspecific "personal effects" without any basis for

doing so.  Plaintiffs' Memorandum of Law at 17.  Because Plaintiffs fail to establish a fundamental

property interest in their personal effects and the City has met the requirements of procedural due

process, Plaintiffs' substantive due process claims fail.  *Nicholas*, 227 F.3d at 142.

Even if we assume that Plaintiffs have a substantive due process right to protection of the

personal property currently within the encampment, the City has not sought to deprive Plaintiffs of

that property, arbitrarily or otherwise.  The City provided multiple notices to Plaintiffs of its intent

to clear the encampment, thereby alerting Plaintiffs of the need to take steps to safeguard their

property.  Next, the City advised Plaintiffs that it would store non-hazardous personal property for

30 days in order to allow Plaintiffs additional time to secure their property.  The steps taken by the

City evidence the City's purpose is to enable Plaintiffs to retain their property, not to take or

destroy Plaintiffs' personal property.

### 4.    Plaintiffs Cannot Establish a Violation of Their Due Process Rights Under the Fourteenth Amendment.

The Due Process Clause applies so long as the City acts to deprive a plaintiff of a

"significant"—and therefore constitutionally protected—property interest.  *See Fuentes v. Shevin*,

407 U.S. 67, 86, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).  The City does not dispute that the

Plaintiffs' non-hazardous personal property is constitutionally protected for purposes of this

motion.

Where the plaintiff has a protected property interest, the determination of whether the

City's procedures unconstitutionally deprive the plaintiff of that property interest depend upon the

Supreme Court's familiar three-part balancing test set forth in *Matthews v. Eldridge*, 424 U.S. 319

(1976): (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used" and the value of "additional or substitute procedural safeguards" in avoiding such errors; and (3) the governmental interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement[s] would entail." *Id*. at 335*; see also Augustin v. City of Philadelphia*, 897 F.3d 142, 148–49 (3d Cir. 2018).

In evaluating the private interest, the inquiry focuses on whether Plaintiffs have a larger interest in pre-deprivation enforcement than in post-deprivation enforcement, analyzing whether Plaintiffs would be prejudiced by the time delay. *Mathews*, 424 U.S. at 340; *see also Memphis Light v. Craft*, 436 U.S. 1, 17 (1978) (delay in utility service will hurt plaintiff because "the discontinuance of water or heating for even short periods of time may threaten health and safety").

Here, Plaintiffs would not be prejudiced by a delay in enforcement. Individual belongings do not rise to the level of "fundamental" interests, and further, the City has given Plaintiffs ample time and notice to gather and remove their belongings, which are illegally stored on public property. Therefore, the first *Mathews* prong weighs in favor of the City.

The second *Mathews* prong looks to "the risk of an erroneous deprivation in the absence of a prior hearing." *Dixon v. Love*, 431 U.S. 105, 113 (1977). Generally, the Constitution requires an opportunity to be heard before the State deprives a person of property. *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). Where there is little risk of error, however, this prong weighs in favor of denying pre-deprivation process. *Los Angeles v. David*, 538 U.S. 715, 718 (2003) (no due process violation because "the straightforward nature of the issue -- whether the car was illegally parked -- indicates that initial towing errors, while they may occur, are unlikely"); *Tillman v. Lebanon*, 221 F.3d 410, 422 (3d Cir. 2000) ("The assessments and takings pursuant to the program involve routine matters of accounting, with a low risk of error."); *cf. Montanez v. DOC*, 773 F.3d 472, 484

24

(3d Cir. 2014) (requiring pre-deprivation notice and distinguishing *Tillman* as involving low-error risk).

Here, the City's procedure allows for little risk of error. First, Plaintiffs have the opportunity to remove their belongings on their own accord, and the City gave proper notice and time for Plaintiffs to do so. Second, any personal belongings left behind at the encampment will be stored in appropriately labeled containers for thirty days, and individuals will be given a receipt. Further, the City will keep its own record of personal belongings in case an individual loses his or her receipt. The City has provided a sufficient procedure for individuals to secure their personal belongings—either through their own removal, or through the benefit of City storage. Therefore, there is little risk of error to Plaintiffs losing their individual belongings without a pre-deprivation hearing, and this prong weighs in favor of the City.

Regarding the governmental interest, in *Sandin v. Conner*, 515 U.S. 472 (1995), the United States Supreme Court expressed a reluctance to allow procedural due process to intrude on core state functions, noting that "federal courts ought to afford appropriate deference to state officials trying to manage a volatile environment." *Id.* at 482; see *also Miller v. Philadelphia*, 174 F.3d 368, 374 (3d Cir. 1999) (parents did not have a pre-deprivation right to participate in emergency child custody hearings, even when parents were present on-site, because such a right "would build delay into the time-sensitive hearings").

Here, the City faces a substantial burden if a pre-deprivation hearing is required. The City created a procedure to allow Plaintiffs and individuals in the encampment to keep their belongings or store them with the City; to afford each individual a pre-deprivation hearing would create a serious administrative burden on the City. The City's process will allow Plaintiffs flexibility to either take their own belongings or store them with the City, in a quick and efficient manner. Further, the City has a responsibility to handle volatile environments in a manner that protects all

25

of its citizens.  To provide each Plaintiff with a pre-deprivation hearing would be too time

consuming in a situation that has already caused discontent amongst other residents.  Thus, the

third prong also weighs in favor of the City, and the City's procedures will not violate Plaintiffs'

procedural due process rights.

### 5.    Plaintiffs Cannot Establish a State-created Danger.

To prevail on this theory, Plaintiffs must prove the following four elements:  1) the harm

ultimately caused was foreseeable and fairly direct; 2) a state actor acted with a degree of

culpability that shocks the conscience; 3) a relationship between the state and the plaintiff existed

such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete

class of persons subjected to the potential harm brought about by the state's actions, as opposed to a

member of the public in general; and 4) a state actor affirmatively used his or her authority in a

way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than

had the state not acted at all.  *Morrow v. Balaski*, 719 F.3d 160, 177 (3d Cir. 2013) (citing *Bright v.

Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006) (citations and internal quotation marks

omitted)).

To adequately establish foreseeability, a plaintiff must show "an awareness on the part of

the state actors that rises to [the] level of actual knowledge or an awareness of risk that is

sufficiently concrete to put the [state] actors on notice of the harm."  *Phillips*, 515 F.3d at 238.  But

the requirement of foreseeability "does not end the analysis."  *Henry v. City of Erie*, 728 F.3d 275,

283 (3d Cir. 2013).  To satisfy the "fairly direct" requirement, a plaintiff must establish that the

state officials' actions "precipitated or w[ere] the catalyst for the harm for which the plaintiff brings

suit."  *Id.* at 285 (alterations in original) (internal citations omitted).  Significantly, this first

element is not easily satisfied because "[s]tate actors are not liable every time their actions set into

motion a chain of events that result in harm."  *Id.* at 283.  Nor is it satisfied if the connection

26

between the state actor's actions and the incurred harm is too attenuated to support liability or is separated by intervening causes. *Quinn v. Badolato*, No. CV 16-0591, 2016 WL 4107701, at *5 (E.D. Pa. July 29, 2016), aff'd, 709 F. App'x 126 (3d Cir. 2017) (unpublished) (citing *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 908 (3d Cir. 1997)); *Grau v. New Kensington-Arnold Sch. Dist.*, 429 Fed.Appx. 169, 172 (3d Cir. 2011).

The second prong requires a plaintiff to establish that the state official acted in a way that "shocks the conscience." *See Henry*, 728 F.3d at 282; *see also Sanford v. Stiles*, 456 F.3d 298, 311 (3d Cir. 2006) ("Mere negligence is not enough to shock the conscience."). "The shocks the conscience standard encompasses only the most egregious official conduct." *United Artists Theater Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392, 400 (3d Cir. 2003) (internal quotations omitted). As such, "negligent behavior can never rise to the level of conscience shocking." *Id.*

The third element of the state created danger theory requires a plaintiff to demonstrate that the plaintiff is either a discrete person or a member of a discrete class of persons distinguishable from the general public that is subject to the harm that the state has allegedly created. *Morse*, 132 F.3d at 912-914.

To establish the fourth element, a plaintiff must show that Defendant: (1) exercised his authority, (2) took an affirmative action; and (3) that the affirmative action created a danger to Plaintiff or rendered him more vulnerable to danger than had Defendant not acted at all. *See Ye v. United States*, 484 F.3d 634, 639 (3d Cir. 2007). "There must be a direct causal relationship between the affirmative act of the state and plaintiff's harm" in order to satisfy this element. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 432 (3d Cir. 2006) (*citing Estate of Smith v. Maras*co, 318 F.3d 497, 510 (3d Cir. 2003) (holding the fourth element asks if "but for the defendants' actions, the plaintiff would have been in a less harmful position")).

Plaintiffs' bare allegations in support of their state created danger claim assume a speculative chain of events for which the City's actions are not a catalyst and which would require the City to act in a specific manner that has not been contemplated prior to or during this action. For Plaintiffs' theory to hold together, the City would have to both intentionally destroy Plaintiffs' property and withhold access to shelter and services.  The City has no intention of taking either of these actions, which is supported both by the plan in place to dissolve the encampment and the steps taken already to provide access to shelter and services, as well as notice to Plaintiffs of the intention to clear the encampment at a set date and time to allow the encampments' organizers and occupants to safeguard their property, either with or without storage by the City.  Plaintiffs simply cannot state a claim alleging an attenuated causal chain premised on fanciful supposition.

### 6.    Plaintiffs Cannot Establish a Violation of the Americans with Disabilities Act.

To state a claim for a violation of Title II or Section 504, Plaintiffs must allege that they are (1) qualified individuals with disabilities, (2) who were denied from participating in or benefitting from a service, program, or activity, or otherwise subject to discrimination, (3) by reason of their disability.  *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 288-89 (3d Cir. 2019) (claims brought under both statutes are considered together because they share substantive standards for determining liability).  When considering whether the second element of a Title II claim has been satisfied, courts must determine whether a plaintiff's allegations actually implicate the accessibility of a "service, program, or activity" of the public entity.  *Id*. at 289- 90.  Inaccessibility of an existing facility, standing alone, is not a cognizable claim under Title II, nor under any of its privately enforceable regulations.  *Babcock v. Michigan*, 812 F.3d 531, 536 (6th Cir. 2016); see also *Kinney v. Yerusalim*, 812 F. Supp. 547, 548 (E.D. Pa. 1993) (recognizing that existing

facilities need not be modified unless necessary to ensure a public entity's services, programs, and activities are readily accessible to individuals with disabilities).

Here, Plaintiffs seek to enjoin the City from removing the encampment but do not, and cannot, allege how such action violates the ADA.  There are no allegations that the removal of the encampment is in any way a service, program, or activity of the City, and more importantly, no allegations as to how such an action discriminates or excludes on the basis of a disability.  Rather, Plaintiffs ADA-related allegations are limited to alleged inaccessible features of shelter facilities not the removal of any encampment.  Any potential ADA violation they allege would persist even if the encampments were to remain.  As a result, plaintiffs cannot show any reasonable probability of success on their ADA claims, nor that any relief on such claims would prevent irreparable harm.

### 7.    Plaintiffs Cannot Establish a Claim for Violation of CDC Guidelines and/or City of Philadelphia Mayoral COVID-19 Orders.

Plaintiffs argue they are likely to succeed on the merit of its claim that the City's action in disassembling the encampment violates CDC guidelines and the City of Philadelphia's COVID-19 Orders.  Plaintiffs' contention fails at the outset, however, because even if these violations were proven, mere violations by the City of CDC guidelines and/or the COVID-19 Orders are not a cognizable claim.  The CDC guidelines are just that, guidance.  There is no requirement that they be followed by municipalities.  Similarly, the COVID-19 Orders do not create a duty on the City which if breached gives rise to a private cause of action.  In their TRO, Plaintiffs do not articulate a specific claim or constitutional right which would be violated.

Plaintiffs seemingly argue that dispersing the individuals currently occupying the encampment would violate the Mayor's Order dated March 22, 2020, or force Plaintiffs to violate the Order; however, dissolution of the encampment is not a violation of the Order on the part of the City nor does it put the individuals in violation of the Order.  The Mayor modified this Order on

June 5, 2020, and July 3, 2020, but the relevant section, as cited by Plaintiffs, remains the same: "Individuals experiencing homelessness are exempt from this directive…."  City Exhibit 3, Mayor's March 22, 2020 Emergency Covid-19 Order, amended June 5, 2020, and July 3, 2020.

Plaintiffs are correct in that the order encourages individuals to obtain shelter, but it does not impose a requirement nor place any civil or criminal penalty on a person who is unable to obtain shelter.[8]  Plaintiffs contend that they were driven to encamp due to "the absence of support from the City."  (*See* Plaintiffs' Memorandum of Law at 23.)  However, since the formation of the encampment the City has made multiple attempts to provide shelter to those at the encampment. The City has offered placement in shelters and at COVID-19 prevention sites (hotels).  These offers were rejected by Plaintiffs.  While it is clear from their Declarations that Plaintiffs would prefer not to stay at shelters, this does not change the fact that the City offered and continues to offer alternative housing to the Plaintiffs and all encampment occupants.

Alternatively, Plaintiffs argue that shelter options are not adequate.  However, to the extent Plaintiffs' arguments could be construed as claims under the Eighth Amendment, here, too, they fail to state a claim because the Eighth Amendment does not apply.  Plaintiffs ask this Court to consider *Shipp v. Schaaf*, 2019 WL 1472303 (U.S. Dist. Ct., N.D. Cal. 2019) (*Shipp I*) in which the U.S. District Court for the Northern District of California granted an *ex parte* temporary restraining order.  In that matter, claims were brought under the Eighth and Fourteenth Amendments. Although the Court did grant a temporary restraining order, the Court ultimately denied the plaintiffs request for a preliminary injunction.  *Shipp v. Schaaf*, 379 F Supp. 3d 1033 (N.D. Cal

---

[8] Importantly, shelter is distinguishable from sleeping outside. The CDC Interim Guidance for local governments on Unsheltered Homelessness and Coronavirus Disease 2019 (COVID-19), last updated August 6, 2020, states, "[i]n the context of COVID-19 spread and transmission, the risks associated with sleeping outdoors or in an encampment setting are different than from staying indoors in a congregate setting such as an emergency shelter or other congregate living facility."  *Interim Guidance on People Experiencing Unsheltered Homelessness*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Aug. 6, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/unsheltered-homelessness.html

2019) (*Shipp II*).

In denying the preliminary injunction, the Court in *Shipp II* examined the requirement of governments to provide shelter if removing a homeless person from public property.  First, the courts look to see whether the Eighth Amendment is implicated.  The *Shipp II* court relied upon *Martin* v. *City of Boise*, which held that the City of Boise violated the constitutional rights of homeless individuals based on enforcement of ordinances which effectively "'criminalized the simple act of sleeping outside on public property' anywhere in the City of Boise…."  *Shipp II*, 379 F. Supp. 3d at 1036 (quoting *Martin v. City of* Boise, 920 F.3d 584, 617 (9th Cir. 2019)).  The court in *Martin* concluded that the Eighth Amendment prohibited the city of Boise from imposing criminal penalties on people for sleeping on public property where there was no option given to sleep indoors.  920 F.3d at 617.  The court made clear however that its holding was limited.  The court emphasized that it does not cover: 1) individuals who *do* have access to adequate temporary shelter; 2) certain time, place, and manner restrictions even where shelter is unavailable; and 3) situations where there is no criminal penalty.  *Martin*, 920 F.3d at 617 n.8.

Here, as in *Shipp II*, there is no criminal penalty being imposed or threatened and no attendant Eighth Amendment requirement to provide shelter or a specific type of shelter.  *Shipp*, 379 F. Supp. 3d at 1037*; Martin*, 920 F.3d at 617 (quoting *Jones v. City of Los Angeles*, 444 F.3d 1118, 1138 (9th Cir. 2006), *vacated*, 505 F.3d 1006 (9th Cir. 2007)("[W]e in no way dictate to the City that it must provide sufficient shelter for the homeless, or allow anyone who wishes to sit, lie, or sleep on the streets…at any time and at any place.") (alteration in original); *see also Kaulana Nani Makali'i O Minoaka O Kipukai Carlos-Kahalekomo v. Cty. of Kauai*, CV 20-00320 JMS-WRP, 2020 WL 4455101, at *3 (D. Haw. Aug. 3, 2020).[9]  Therefore, unlike for example, the

---

[9] "Courts following *Martin* have declined to expand its holding beyond criminalization of homelessness."  *Young v. City of L.A.*, 2020 WL 616363, at *5 (C.D. Cal. Feb. 10, 2020) (citing *Aitken v. City of Aberdeen*, 393 F. Supp. 3d 1075, 1081-82 (W.D. Wash. 2019) (collecting cases)).  "*Martin* does not limit the [c]ity's ability to evict homeless

prison setting, there can be no claim under the Eighth Amendment regarding the adequacy of the shelter offered or provided.

Nor has the analysis drastically changed due to COVID-19.  This very issue was considered by the court in *Frank v. City of St. Louis*, 4:20-CV-00597 SEP, 2020 WL 2116392 (E.D. Mo. May 2, 2020).  In *Frank,* the court denied the temporary restraining order filed by an occupant of an encampment scheduled to be cleared by the City of St. Louis, concluding there was no violation of the Eighth Amendment due to lack of any criminal penalty or sanction and, even if there were, no violation would exist because St. Louis was providing the opportunity for all occupants to be placed in alternative housing.  *Id.* at *3-*4.  The court in this case looked at the CDC guidelines regarding encampments and found where the city was offering spaces and sheltering opportunities, the guidelines were being met.  *Id.* at *3.  Additionally, the court recognized the decisions being made by public health experts and the conditions of the encampment itself, stating that "[d]uring times of public health crises, local governments have broad latitude to institute protective measures so long as those measures have "a 'real or substantial relation' to the public health crisis."  *Id.* (quoting *In re Rutledge*, No. 20-1791, 956 F.3d 1018, ——, 2020 WL 1933122, at *5 (8th Cir. 2020) (quoting *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 31 (1905))).  The court also found that the notice and order issued identified the encampment as a health threat related to the COVID-19 pandemic and that a court should be "hesitant to use its equitable powers to second-guess the reasonable and informed decisions of public health experts."  *Id.* at *4 (citing *McDougall v. County of Ventura California*, No. 20-CV-02927-CBM-(ASx), 2020 WL 2078246, at *2 (C.D. Cal. Apr. 1, 2020) (deferring to county government's determination as to how to combat the spread

---

individuals from particular public places."  *Aitken*, 393 F. Supp. at 1082.  And "*Martin* does not establish a constitutional right to occupy public property indefinitely at Plaintiffs' option."  *Miralle v. City of Oakland*, 2018 WL 6199929, at *2 (N.D. Cal. Nov. 28, 2018).

of COVID-19)).

For these reasons Plaintiffs cannot prove a claim related to the CDC guidelines or the City of Philadelphia Mayor's Orders on COVID-19.

### B.        Plaintiff Cannot Establish a Threat of Immediate, Irreparable Harm

Plaintiff cannot establish irreparable harm.  In order to obtain the extraordinary remedy of emergency injunctive relief, Plaintiffs must show that they will suffer irreparable harm if the motion is denied.  *Miller v. New Jersey*, No. 13-2018, 2013 WL 2149692, at *9-11 (D.N.J. May 16, 2013).  A party seeking injunctive relief must also show that the harm is immediate in that it is presently existing and not a remote or speculative possibility.  *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 205 (3d Cir. 1990); *see also Anderson v. Davila*, 125 F.3d 148, 163-164 (3d Cir. 1997).  In addition, irreparable harm "must be of a peculiar nature," which cannot be adequately redressed by monetary damages such as "loss of control of reputation, loss of trade, and loss of good will," or the loss of First Amendment freedoms.  *Opticians Ass'n of America v. Independent Opticians of American*, 920 F.2d 187, 195 (3d Cir. 1990); *see also, e.g. Anderson*, 125 F.3d at 163-164.  However, mere implication of First Amendment freedoms is insufficient to warrant injunctive relief.

Plaintiffs have not alleged that immediate, irreparable harm will result from the City's action to clear the encampment.  Most of Plaintiffs' alleged harm centers on their contention that the City seeks to destroy the personal property of the organizers and occupants of the encampments.  Even if this were not patently false, personal property may be redressed by monetary damages.  Plaintiffs' additional allegations ask this Court to contemplate a false choice: the encampment or nothing.  At no point in time has the City sought to clear the encampment without also seeking to provide services and shelter to Plaintiffs and the other occupants.

**C.     Plaintiffs' Sought Relief, Entry of an Injunction, Is Not in the Public Interest and the Balance of Equities Favors Defendants**

Because Plaintiffs are unable to establish a likelihood of success on the merits or likelihood of irreparable harm, the Court need not go any further in its analysis.  *Greater Philadelphia Chamber of Commerce v. City of Philadelphia*, 949 F.3d 116, 133 (3d Cir. 2020) (stating that only if movant establishes a likelihood of success on the merits and the existence of irreparable harm should "the district court consider the remaining two factors"). Regardless, the balance of interests weighs in favor of denying Plaintiffs' motion.

In considering the extraordinary remedy of an injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.  In exercising their sound discretion, courts of equity should pay particular regard for the public consequences[.]"  *Winter v. Nat'l Resources Def. Council*, 555 U.S. 7, 24 (2008) (internal quotations and citations omitted); *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 747 (2d Cir. 1994).  Where the defendant is the government, the Court may consider these final two factors together.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

The equities in this matter favor allowing the City to move forward and exercise its police powers to ensure the public health, safety, and welfare of the encampment's occupants and the public at large.  The remedy here is to allow the City to perform its duty to make the area safe and available to the public again, and to work with those in need of housing and services to obtain both in a safe and sanitary environment.

## V. <u>CONCLUSION</u>

For all the reasons set for above, Defendants respectfully request that this Court deny

Plaintiff's Motion for a Temporary Restraining Order.


CITY OF PHILADELPHIA LAW DEPARTMENT
MARCEL S. PRATT, CITY SOLICITOR

*/s/ Kristin K. Bray*
By: **Diana P. Cortes, Esq.**
Chair, Litigation Group
PA Bar No. 204274
(215) 683-5038/diana.cortes@phila.gov
**Kristin K. Bray, Esq.**
Chief Deputy City Solicitor, Code & Public Nuisance Litigation
PA Bar No. 200737
(215) 683 – 5408 / kristin.bray@phila.gov
City of Philadelphia Law Department
1515 Arch Street, 15th Floor
Philadelphia, PA 19103-1595


Dated: August 19, 2020

## CERTIFICATE OF SERVICE

I, Kristin K. Bray, hereby certify that I caused to be served today one copy of the foregoing Response to Plaintiffs' Motion for a Temporary Restraining Order upon the person and in the manner indicated below:

<u>Via CM/ECF and EMAIL</u>:

MICHAEL N. HUFF, ESQUIRE
The Law Offices of Michael Huff, Esq.
1333 Race Street
Philadelphia, PA 19107
(215) 567-2120
michael.huff.esq@gmail.com
*Attorney for the Plaintiffs*

<u>/s/ ***Kristin K. Bray***</u>
Kristin K. Bray, Esq.
City of Philadelphia Law Department

Dated: August 19, 2020