IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Murray et al. | : | CIVIL ACTION |
| | : | NO. 20-04018 |
| | : | |
| v. | : | |
| | : | |
| | : | |
| The City of Philadelphia | : | |
| et al. | : | |

**MEMORANDUM DENYING TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION[1]**

EDUARDO C. ROBRENO, J.                    August 25, 2020

# Table of Contents

I.    FACTUAL BACKGROUND........................................ 3

II.   LEGAL STANDARD............................................ 8

III.  DISCUSSION............................................... 8

  A.    Likelihood of Success on the Merits .................... 8
    1.    First Amendment Claim ............................... 10
    2.    Fourth Amendment Claim .............................. 12
    3.    Fourteenth Amendment Claims ......................... 15
    a.    Substantive due process ............................. 15
    b.    Procedural due process .............................. 17
    4.    Americans with Disabilities Act Claim ............... 20
    5.    State-Created Danger Claim .......................... 22

  B.    Likelihood of Irreparable Harm ........................ 25

IV.   CONCLUSION............................................... 26

---

[1] This memorandum constitutes the Court's findings of fact and conclusions of law, pursuant to Fed. R. Civ. P. 52(a)(2).

**PROLOGUE:**

This case pits the City of Philadelphia's power and responsibilities to safeguard the health, safety, and welfare of its residents against the claims by protesters to constitutional protection for their occupation of City property. The protestors have occupied two properties owned by the City and one property owned by an agency of the Commonwealth, including two parks widely used by the general public, as a way to highlight and force a solution to the plight of the Philadelphia homeless.

This conflict does not take place in a vacuum. For many years now the growing problem of homelessness has not escaped public notice. Nor is the problem unique to Philadelphia—cities like Seattle, San Francisco, or Denver have similar issues. The problem of homelessness is one of national dimension.

And yet, despite the enormity of the problem, the principles of Federalism limit federal courts to fixing the outer limit to the City's exercise of its police power in light of the protestors' claims to constitutional protection. Therefore, while the Court will decide the legal issues, it will not seek, nor is it equipped to offer, permanent solutions to the problem of homelessness. Admittedly, the larger issues are complicated, including: What type of housing, if any, should the City provide? How many beds should the City make available? Should the City provide (or increase) mental health or drug

addiction treatment? Should the City provide alternative sites for encampments? If so, where should they be located? Should the City house the homeless in hotel rooms? How can families be kept together? Should the City provide educational or other forms of training to promote employment opportunities? If additional funding is needed, where will it come from? And many other significant issues.

The task of finding if not a solution at least some relief to this crisis rests squarely on the shoulders of the City's elected officials. It is an enormous challenge. But further indecision and neglect will only make it worse.

## I.   FACTUAL BACKGROUND

Plaintiffs Irvin Murray, Maurice Scott, Dolores McFadden, Faith Anne Burdick, and Edwin Jones are residents of Philadelphia homeless encampments.[2] Two of the Plaintiffs are women, three are men, and all five are African American. Defendants are: the City of Philadelphia ("City"); Mayor James Kenney; and the Philadelphia Housing Authority ("PHA"), which is an agency of the Commonwealth of Pennsylvania.[3] Currently pending

---

[2] Plaintiffs also purport to represent "all other residents of the encampments at Von Colln Field, Jefferson and Ridge, and the Azalea Gardens." Pls.' Mot. for TRO and Prelim. Inj. ("Pls.' TRO Mot.") 1, ECF No. 5. Because Plaintiffs have neither offered evidence as to why they are authorized to represent other encampment residents nor moved for class certification pursuant to Fed. R. Civ. P. 23, the Court construes the motion as brought only by the five named Plaintiffs.

[3] On August 20, 2020, the PHA submitted a motion for leave to file a brief as amicus curiae that described the PHA's interest in the case as "urgent." PHA

before the Court is Plaintiffs' Motion for a Temporary
Restraining Order and Preliminary Injunction enjoining
Defendants from dissolving those encampments.

The facts in this case are largely undisputed. Plaintiffs
are residents of three encampments in the City of Philadelphia
located at: (1) Von Colln Memorial Field ("Von Colln"); (2)
Jefferson and Ridge; and (3) the Azalea Garden. The Von Colln
and Azalea Garden encampments are on City property, while the
Jefferson and Ridge encampment is on land owned by the PHA. The
Von Colln and Azalea Garden encampments are located in public
parks near the center of the City in an area containing numerous
historical and tourist attractions. The Benjamin Franklin
Parkway, which abuts the Von Colln encampment, is the site of
numerous parades and other large gatherings in a typical year.
The Jefferson and Ridge encampment is a few miles away from the
center of the City and is located in a vacant lot across the
street from the PHA headquarters building at 2013 Ridge Avenue
that was previously used for parking.

---

Amicus Br. 1, ECF No. 15. Also on that date, the PHA sent a letter to the
Court listing three witnesses whom "the PHA, or attorneys for the City of
Philadelphia, may call" to testify at the August 20, 2020, hearing. Counsel
for the PHA was present at the hearing, and the City called two of the PHA's
witnesses: Nicholas Dema and Darnetta Arce. At the hearing, the Court deemed
these actions to be an oral motion by the PHA to intervene as a Defendant and
denied that motion. Upon reconsideration sua sponte, the Court grants the
PHA's motion to intervene and orders that the PHA shall be joined as a party
pursuant to Fed. R. Civ. P. 19, which requires joinder of a party who "claims
an interest relating to the subject of the action and is so situated that
disposing of the action in the person's absence may . . . impair or impede
the person's ability to protect the interest."

The encampments formed during the summer of 2020, and
Plaintiffs allege that they constitute protests advocating for
fair housing for the homeless. Approximately 230 people
currently reside in the encampments.[4] The land on which the
encampments are located is not equipped to provide access to
running water, electricity, or sanitary facilities for a large
number of people. However, the occupants of the Von Colln
encampment have tapped into the City's power grid for
electricity, siphoned water from a nearby City fountain, and
procured portable toilets. Outside supporters of the encampments
supply food donations to encampment residents.

City officials and outreach workers are not permitted to
visit the encampments, and general public access to the
encampments has ceased. Recreational and other activities
ordinarily conducted at Von Colln have been cancelled or
postponed.

Neighbors have complained that the encampment at Von Colln
denies them access to the park and to the annexed athletic
facilities. They also complain of aggressive panhandling and
criminal activity in the area. In a span of two months this
summer, City officials received more than 200 complaints about

---

[4] Although none of Plaintiffs' witnesses at the August 20, 2020, hearing were
residents of the Jefferson and Ridge encampment, for the purposes of this
motion the Court will accept Plaintiffs' representation that approximately 35
people currently reside at that encampment.

nuisance-like behavior stemming from the encampments.
Defendants, however, have not identified any police arrests of
encampment residents. Moreover, neighbors of the Jefferson and
Ridge encampment contend that it interferes with the
construction of a building that will house a bank and grocery
store greatly needed by the community.

On July 10, 2020, the City posted written notices at the
Von Colln encampment informing residents that their occupancy
was unlawful and that they must leave the location and remove
their personal property by July 17, 2020. The notices stated
that the City would store personal property for 30 days and
would consider stored property not retrieved within 30 days to
be abandoned. The notices also directed residents seeking
shelter or services to Homeless Outreach and the Department of
Behavioral Health and Intellectual disAbility Services and
included information about how to contact those services.
Residents of the Jefferson and Ridge and Azalea Garden
encampments received similar notices instructing them to vacate
by July 17, 2020.

Encampment residents did not vacate by the deadline. On
August 17, 2020, the City sent additional notices to the
residents informing them that they must vacate and remove their
possessions by August 18, 2020, at 9:00 a.m. The City represents
that it intends only to dissolve the encampments and does not

seek to impose civil or criminal penalties on encampment residents.

On August 17, 2020, Plaintiffs filed the Motion for Temporary Restraining Order and Preliminary Injunction seeking to bar Defendants from disbanding the encampments. On August 20, 2020, the Court held a hearing on the fully briefed motion. Plaintiffs called encampment residents Jonnell Johnson, Irvin Murray, and Jeremy Williams as fact witnesses and Professor Stephanie Sena, Anti-Poverty Fellow and Professor of Poverty and Policy at Villanova University Charles Widger School of Law, as an expert witness.[5] Defendants called: Eva Gladstein, Deputy Managing Director for Health and Human Services for the City of Philadelphia; Dennis Boylan, President of the Board of the Logan Square Neighborhood Association of Philadelphia; Nicholas Dema, PHA Executive Vice-President of Planning Development; and

---

[5] Under Fed. R. Evid. 702, a witness who is "qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." At the August 20, 2020, hearing, Defendants moved to strike portions of Professor Sena's testimony for failure to meet the requirements of Rule 702. The Court took the motion under advisement and now grants Defendants' motion. While Professor Sena is qualified to testify by way of her specialized knowledge, the portions of her testimony in question failed to identify and apply reliable principles and methods to the facts of this case. However, the Court notes that its analysis of the case would not change even if the entirety of Professor Sena's testimony were admitted.

Darnetta Arce, Executive Director of the Brewerytown-Sharswood
NAC. The Court heard further oral argument on August 24, 2020.

At the conclusion of the August 20, 2020, hearing,
Defendants voluntarily placed the planned encampment
dissolutions on hold pending the outcome of this motion.

## II.  LEGAL STANDARD

Preliminary injunctive relief is an "extraordinary remedy"
that courts should grant "only in limited circumstances."
Holland v. Rosen, 895 F.3d 272, 285 (3d Cir. 2018) (quotation
omitted), cert. denied, 139 S. Ct. 440 (2018). The party moving
for such relief must demonstrate: "(1) a reasonable likelihood
of success on the merits; (2) irreparable harm to the applicant;
(3) whether the denial of a preliminary injunction would injure
the moving party more than the issuance of an injunction would
harm the non-moving party; and (4) whether the grant of relief
would serve the public interest." Id. at 285–86 (citation
omitted). Because "the first two factors are prerequisites for a
movant to prevail," the Court need not reach the third and
fourth factors if it determines that a plaintiff has failed to
establish the first two. Id. at 286.

## III. DISCUSSION

### A.    Likelihood of Success on the Merits

A municipality's broad authority to advance the welfare,
safety, and health of its residents is known as its "police

power." Police power includes the ability to enact rules governing everyday affairs, and the power to enforce those rules.

Municipalities, as such, have no inherent police power. Police power reposes in the state, which may delegate that power to a municipality, including by a constitutional "home rule" provision. Philadelphia has a home rule charter providing that the city shall "have complete powers of legislation and administration in relation to its municipal functions," 53 Pa. Cons. Stat. § 13131 (1999). By adopting the charter, "the city was then clothed with police power. This necessarily encompassed authority to enact such ordinances as are for the health and welfare of its citizens." Warren v. City of Philadelphia, 382 Pa. 380, 384 (1955).

While broad, a municipality's police power is subject to limits, including those imposed by the United States Constitution. See, e.g., Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton, 536 U.S. 150, 169 (2002) (striking down a municipal ordinance requiring a permit for door-to-door canvassing as violating the First Amendment). Plaintiffs argue that they are likely to prevail on their claims that the City has exceeded the permissible scope of its police power by seeking to disband the encampments. For the following reasons, the Court disagrees.

1.   First Amendment Claim

The First Amendment to the United States Constitution prohibits laws "abridging the freedom of speech," U.S. Const. amend. I, and is applicable to the states via the Fourteenth Amendment. The extent to which government may limit speech turns on the nature of the forum in which the speech occurs. See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 797 (1985).

The Court will presume for the purposes of this analysis that the encampments constitute traditional public fora, which enjoy a higher level of constitutional protection than other fora.[6] See United States v. Kokinda, 497 U.S. 720, 726 (1990). A traditional public forum is property that "has been traditionally open to the public for expressive activity, such as public streets and parks." Id.

To determine whether speech restrictions in a traditional public forum are constitutional, courts apply the time, place,

---

[6] The PHA asserts that the Jefferson and Ridge encampment is at most a nonpublic forum for purposes of First Amendment analysis. A nonpublic forum is "[p]ublic property which is not by tradition or designation a forum for public communication." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 46 (1983). The government may restrict access to a nonpublic forum as long as the restrictions are "reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view." Cornelius, 473 U.S. at 800. The Court need not determine the Jefferson and Ridge encampment's First Amendment forum status at this time. Because Plaintiffs have not demonstrated that they are likely to succeed under the time, place, and manner analysis, which affords their expressive activity a higher level of constitutional protection than a nonpublic forum, the Court concludes that they are unlikely to succeed under the less protective nonpublic forum analysis.

10

and manner doctrine. Under that doctrine, "the government may
regulate the time, place, and manner of . . . expressive
activity, so long as such restrictions are content neutral, are
narrowly tailored to serve a significant governmental interest,
and leave open ample alternatives for communication." United
States v. Marcavage, 609 F.3d 264, 279 (3d Cir. 2010) (quoting
Burson v. Freeman, 504 U.S. 191, 197 (1992)).

Content Neutral: Plaintiffs allege that Defendants' actions
are not content neutral because Defendants have not served
notices to vacate on any other Philadelphia protests in recent
months. However, Plaintiffs have not identified any other
protest that has constituted a weeks-long, round-the-clock
occupation of City property to the exclusion of other City
residents, nor have they offered persuasive evidence indicating
that City officials seek to dissolve the encampments because of
the residents' expressive message.

Narrowly Tailored to Serve a Significant Governmental
Interest: A time, place, and manner regulation is "narrowly
tailored" if it "promotes a substantial government interest that
would be achieved less effectively absent the regulation." Ward
v. Rock Against Racism, 491 U.S. 781, 799 (1989). The regulation
need not be the "least restrictive or least intrusive means of
doing so," though it must not "burden substantially more speech

11

than is necessary to further the government's legitimate interests." Id.

The City has a significant interest in exercising its police powers to ensure the health, safety, and welfare of all City residents. City officials have reasonably determined that the encampments pose health and safety risks to encampment residents and to other community members, and Plaintiffs have not offered evidence indicating how the City could ameliorate these risks without dissolving the encampments.

Ample Alternatives for Communication: Defendants have also indicated that there are ample alternative opportunities available for Plaintiffs to protest. Defendants represent that encampment residents are free to exercise the same First Amendment rights all City protestors enjoy, including access to the parks where the encampments are currently located, provided they do so in a manner consistent with existing law.

For these reasons, Plaintiffs have not established that they are likely to succeed on their claim that dissolving the encampments would violate their First Amendment rights.

### 2.   Fourth Amendment Claim

The Fourth Amendment to the United States Constitution protects against "unreasonable searches and seizures," U.S. Const. amend. IV, and is applicable to the states via the Fourteenth Amendment. A "seizure" of property occurs where

"there is some meaningful interference with an individual's possessory interests in that property." Soldal v. Cook Cnty., 506 U.S. 56, 61 (1992) (quotation omitted). Determining whether a seizure is reasonable requires "careful balancing of governmental and private interests." Id. at 71.

Plaintiffs contend that the seizure and destruction of encampment residents' personal property is unreasonable. Defendants counter that any such seizures are reasonable because Defendants provide sufficient notice and procedural protections before seizing personal property, see infra Section III.A.3.b, and because they have a legitimate interest in removing property that contributes to unsafe and hazardous conditions.

In Hooper v. City of Seattle, No. C17-0077, 2017 WL 591112 (W.D. Wash. Feb. 14, 2017), residents of a homeless encampment sought an order enjoining Seattle officials from seizing and destroying their property. The city's applicable policy required officials to provide at least 72 hours before any encampment clean-up, store personal property left behind, and post notices that such property could be recovered. Id. at *5-6. The plaintiffs alleged that officials had a history of noncompliance with this policy and often destroyed personal property without providing the required notice or opportunity to retrieve seized items. But the court determined that these allegations were not sufficient for plaintiffs to establish a likelihood of success

13

on their Fourth Amendment claim, as the defendants' declarations
indicated that officials "have provided notice and followed the
procedural safeguards contained in the [policy], and have even
gone beyond those safeguards in many instances." Id. at *7; see
also Proctor v. District of Columbia, 310 F. Supp. 3d 107, 116
(D.D.C. 2018) (finding no likelihood of success on the merits of
a Fourth Amendment claim where "the District of Columbia
provides [encampment] residents with notice of the specific
date, time, and place of a scheduled cleanup, allowing them two
weeks to move their possessions or pack them for storage" and
"tries to help the owners not only by providing them containers
to store or move their belongings but also by seeking to arrange
housing and provide other services"); Martin v. City & Cnty. of
Honolulu, No. CV 15-00363, 2015 WL 5826822, at *7 (D. Haw. Oct.
1, 2015)(finding no likelihood of success on the merits of
Fourth and Fourteenth Amendment claims where city policy
required officials to provide notice before removing homeless
individuals' possessions from public property and "only
dispose[] of items that pose a risk to public health or
safety").

Likewise, Plaintiffs have not demonstrated that they are
likely to prevail on their claim that Defendants' seizure of
their property following encampment dissolution would be
unreasonable. Defendants have provided notice of planned

14

property removal and instituted procedural safeguards to protect
against property loss, see infra Section III.A.3.b, and they
represent that they will follow these practices with respect to
Plaintiffs' property. As such, Plaintiffs have not established
that they are likely to prevail on their Fourth Amendment claim.

### 3.   Fourteenth Amendment Claims

The Fourteenth Amendment to the United States Constitution
prohibits deprivation of "life, liberty, or property, without
due process of law." U.S. Const. amend. XIV, § 1. Plaintiffs
raise both substantive and procedural claims under the
Amendment.

### a. Substantive due process

Substantive due process protects "against 'certain
government actions regardless of the fairness of the procedures
used to implement them.'" Newark Cab Ass'n v. City of Newark,
901 F.3d 146, 155 (3d Cir. 2018) (quoting Collins v. City of
Harker Heights, 503 U.S. 115, 125 (1992)). The Third Circuit has
recognized two threads of substantive due process: "substantive
due process relating to legislative action and substantive due
process relating to non-legislative action." Id. (citing
Nicholas v. Pa. State Univ., 227 F.3d 133, 139 (3d Cir. 2000)).
Generally, legislative acts are "laws and broad executive
regulations [that] apply to large segments of society,"
Nicholas, 227 F.3d at 139 (quotation and citations omitted),

15

while non-legislative acts "typically apply to one person or to a limited number of persons." Id.

On the record before the Court at this time, Plaintiffs appear to challenge a non-legislative action: Defendants' planned encampment dissolution. To prevail on a non-legislative action substantive due process claim, a plaintiff must establish "a protected property interest to which the Fourteenth Amendment's due process protection applies." Id. (quotation and citation omitted). To do so, a plaintiff must show that the property interest is "fundamental under the United States Constitution." Id. (quotation and citation omitted).

Plaintiffs have not demonstrated that they are likely to prevail on their claim that their personal effects constitute fundamental property interests of which Defendants seek to deprive them. First, "the only protected property interests [the Third Circuit has] thus far deemed fundamental involved ownership of real property," Newark Cab Ass'n, 901 F.3d at 155 (citing Nicholas, 227 F.3d at 141), and courts "have been generally reluctant to expand the scope of substantive due process protection." Id. (citing Collins, 503 U.S. at 125). Second, even if the Court were to assume that Plaintiffs' property interests are fundamental for the purposes of substantive due process analysis, the record indicates that Defendants do not intend to deprive Plaintiffs of their

16

property. Instead, Defendants represent that they have
instituted safeguards to prevent depriving Plaintiffs of such
property. See infra Section III.A.3.b.

### b. Procedural due process

Courts balance the following factors to determine the
specific dictates of procedural due process: "First, the private
interest that will be affected by the official action; second,
the risk of an erroneous deprivation of such interest through
the procedures used, and the probable value, if any, of
additional or substitute procedural safeguards; and finally, the
Government's interest, including the function involved and the
fiscal and administrative burdens that the additional or
substitute procedural requirement would entail." Mathews v.
Eldridge, 424 U.S. 319, 335 (1976).

Plaintiffs allege that the City is "threatening to destroy
Plaintiffs' property without any opportunity to challenge the
basis for the destruction." Pls.' TRO Mot. 19. They also
highlight that while the notices to vacate inform encampment
residents that any property left at the encampments after the
posted clearance date will be removed, the notices do not
provide information about where such property will be stored or
how owners can retrieve it.

The City notes that the posted notices inform residents of
the need to remove their belongings and the timeframe in which

to do so. Defendants also highlight that the notices describe which items left at encampments following dissolution will be considered hazardous (and consequently disposed of) and which will be stored by the City for 30 days. Ms. Gladstein credibly testified that the City provides encampment residents whose items are placed in storage with documentation indicating where the items will be stored, the length of time for which the City will hold the property, and how the owner can retrieve it. Individuals whose items are placed in storage receive a receipt allowing them to reclaim that property, and the City maintains a record of the stored property in case an owner misplaces the receipt. City officials represent that they will follow this practice with respect to Plaintiffs' property.

Ms. Gladstein also testified that City officials considered enacting a formal policy governing the City's removal and storage of possessions following encampment dissolution, but that advocacy organizations with whom they conferred advised against doing so. The Court recommends that the City adopt a written policy governing these matters in the future. But on the record before the Court at this time, Plaintiffs have not demonstrated that they are likely to succeed on their claim that the lack of a formal policy renders the City's practices constitutionally deficient.

18

On its face, the City's practice provides constitutionally sufficient notice and opportunity before removing Plaintiffs' property. For the purposes of this analysis, Defendants do not dispute that Plaintiffs have a protected property interest in their non-hazardous personal property. But posted notices have informed Plaintiffs that they must remove their belongings and that they may do so on their own accord or place them in City storage, and Defendants indicate that any Plaintiff who places items in storage will receive information about how to retrieve that property.

The Court notes that Defendants' decision not to enforce the deadline described in the July 10, 2020, notices could reasonably lead Plaintiffs to conclude that Defendants' August 17, 2020, notices constitute yet another instance of Defendants' "crying wolf." For this reason, the Court will require Defendants to post an additional notice providing at least 72 hours' notice to vacate before removing Plaintiffs or their property from the encampments.

Based on the evidence in the record at this time, Plaintiffs have not established that Defendants will deviate from their stated practices with respect to Plaintiffs' belongings. As such, the Court concludes that Plaintiffs have not demonstrated a likelihood of success on the merits of their Fourteenth Amendment claim. See Miralle v. City of Oakland, No.

19

18-cv-06823, 2018 WL 6199929, at *3 (N.D. Cal. Nov. 28, 2018) (finding no likelihood of success on the merits of a Fourteenth Amendment claim where city policy required posting a 72-hour notice of an encampment closure, storing any property left on the site following the closure other than that deemed unsafe or hazardous, posting a "Notice of Collected Property" and giving information about how to retrieve belongings, and offering assistance with moving any belongings); Sullivan v. City of Berkeley, No. C 17-06051 WHA, 2017 WL 4922614, at *6 (N.D. Cal. Oct. 31, 2017)(finding no likelihood of success on the merits of Fourth and Fourteenth Amendment claims where plaintiffs were "given an opportunity to remove their personal effects from [transit authority] property, and, pursuant to [transit authority] policy, will be notified of the location of any seized property, which will be stored from anywhere between 14 and 90 days").

## 4.   Americans with Disabilities Act Claim

Title II of the Americans with Disabilities Act ("ADA") provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To state a claim for an ADA violation, a plaintiff must allege that he is: (1) a

qualified individual with a disability (2) who was precluded from participating in a program, service, or activity, or otherwise was subject to discrimination, (3) by reason of his disability. Furgess v. Pa. Dep't of Corr., 933 F.3d 285, 288–89 (3d Cir. 2019).

On the record currently before the Court, Plaintiffs have not demonstrated that they are likely to succeed on the merits of their claim that dissolving the encampments would violate the ADA. Plaintiffs allege that encampment residents "have been denied access to shelters or hotel rooms because they do not provide adequate disability accommodations" and that "[m]any shelter doors cannot be opened by wheelchair-bound people." Pls.' TRO Mot. 22. While these allegations may support a claim that City shelters fail to meet ADA requirements, Plaintiffs have not offered sufficient evidence to support a finding that the City's encampment dissolution process is a "program, service, or activity" that excludes or discriminates against Plaintiffs on the basis of disability. Plaintiffs have also not offered specific evidence indicating that any of the five named Plaintiffs is currently experiencing a disability that falls within the ADA's protection. The Court therefore determines that Plaintiffs have not demonstrated a likelihood of success on the merits of their ADA claim.

5.   State-Created Danger Claim

Under the "state-created danger" doctrine, "liability may

attach where the state acts to create or enhance a danger" that

deprives the plaintiff of his or her constitutional rights.

Morrow v. Balaski, 719 F.3d 160, 177 (3d Cir. 2013) (citing

Kneipp v. Tedder, 95 F.3d 1199, 1205 (3d Cir. 1996)). To prevail

on this theory, a plaintiff must demonstrate that: "(1) the harm

ultimately caused was foreseeable and fairly direct; (2) a state

actor acted with a degree of culpability that shocks the

conscience; (3) a relationship between the state and the

plaintiff existed such that the plaintiff was a foreseeable

victim of the defendant's acts, or a member of a discrete class

of persons subjected to the potential harm brought about by the

state's actions, as opposed to a member of the public in

general; and 4) a state actor affirmatively used his or her

authority in a way that created a danger to the citizen or that

rendered the citizen more vulnerable to danger than had the

state not acted at all." Id. at 177 (citing Bright v.

Westmoreland Cnty., 443 F.3d 276, 281 (3d Cir. 2006)).

Plaintiffs allege that they would be "better off if

Defendants did nothing" and allowed them to remain in their

encampments. Pls.' TRO Mot. 21. They argue that encampment

dissolution endangers residents' welfare because of "the

completely full occupancy of the Philadelphia shelters" and "the

22

demonstrably dangerous and unsanitary conditions" at those shelters. Id. Plaintiffs also note that destroying homeless individuals' property places them in danger of sleeping outdoors without protection from the weather and risks depriving them of medication and medical equipment.

At the August 20, 2020, hearing, Ms. Gladstein testified that there are currently at least 300 shelter beds available, and that those beds are spread across male, female, and family shelters. She also testified that other City-provided housing, including hotel rooms, is also available. The City has repeatedly represented that it will find shelter for any person displaced by encampment removal who is willing to accept such shelter. Plaintiffs dispute that Defendants will be able to do so, including because many encampment residents are adults who would not qualify for admission to family shelters. However, Plaintiffs' fact witnesses testified that they would not accept a shelter bed from the City even if offered one.

The factual dispute between the parties about the specific contours of immediately available housing for all encampment residents is complex. However, Defendants have offered persuasive evidence of sufficient housing options for the five Plaintiffs currently before the Court. See Cobine v. City of Eureka, No. 16-02239, 2016 WL 1730084, at *3 (N.D. Cal. May 2, 2016) ("Although the Court is sympathetic to the plight of all

the homeless population in Eureka, the Court only has discretion to address the concerns of the eleven individual plaintiffs currently represented before it.").

At the August 20, 2020, hearing, Plaintiffs' witnesses offered credible testimony of their own experiences with dangerous and patently subpar shelter conditions. However, on the record before the Court at this time, Plaintiffs have not persuaded the Court that they are likely to succeed on a claim that these conditions are so pervasive and severe that Defendants' decision to dissolve the encampments and encourage Plaintiffs to accept available beds in City shelters "shocks the conscience" and leads to "foreseeable and fairly direct" harm, as required to succeed on a state-created danger claim.

Under these circumstances, Plaintiffs have not demonstrated that they are likely to satisfy the first prong of the state-created danger analysis—i.e., foreseeable and direct harm. Defendants represent that they have shelter available for Plaintiffs, and that they will comply with procedural safeguards governing any storage of Plaintiffs' property. See supra Section III.A.3.b. Therefore, the future harm Plaintiffs describe relies on a speculative and attenuated chain of causation that is unlikely to constitute "foreseeable and direct" harm. Because Plaintiffs have not demonstrated that they are likely to satisfy

the first element of a state-created danger claim, the Court
need not consider the remaining elements.

For the foregoing reasons, the Court concludes that
Plaintiffs have not established a likelihood of success on the
merits with respect to any of the claims currently before the
Court.

### B.    Likelihood of Irreparable Harm

The second element of the preliminary injunction analysis
provides that injunctive relief is available only where the
movant will suffer "irreparable harm" absent such relief.
Holland v. Rosen, 895 F.3d 272, 285 (3d Cir. 2018), cert.
denied, 139 S. Ct. 440 (2018). Irreparable harm is an injury "of
a peculiar nature" such that "compensation in money alone cannot
atone for it." Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700,
727 (3d Cir. 2004) (quotation omitted).

Plaintiffs argue that they are likely to suffer irreparable
harm absent injunctive relief because Defendants' policies and
practices will violate their constitutional and property rights.
They highlight that they will be cast out of their semi-
permanent residences and face temporary or permanent property
deprivation.

Defendants counter that they have sought to provide access
to shelter and other services to Plaintiffs and other encampment

residents. They further contend that monetary damages would fully redress any property loss Plaintiffs suffer.

The Court is sympathetic to Plaintiffs' account of the significant challenges that accompany encampment dissolution. However, it need not determine whether Plaintiffs have demonstrated that they will suffer irreparable harm as a result of such dissolution, as they have not established a likelihood of success on the merits.

Likewise, given that Plaintiffs have not satisfied the first step of the test for granting a preliminary injunction, the Court need not reach the third and fourth prongs. See Holland v. Rosen, 895 F.3d 272, 286 (3d Cir. 2018), cert. denied, 139 S. Ct. 440 (2018).

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction will be DENIED.

Accordingly, Defendants are permitted, but not required, to dissolve and terminate the encampments by reasonable means of their choosing subject to the conditions that those occupying the encampments be provided with at least 72 hours' notice to vacate the encampments and that Defendants fully comply with their stated procedures, including but not limited to storage

26

and safekeeping of any property collected at the encampment sites. The Court shall retain jurisdiction.

An order consistent with this memorandum shall issue.